Stephen A. MILITSKY, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., et al., Defendants.

Civ. A. No. C76–224.

United States District Court,
N. D. Ohio, E. D.

Oct. 24, 1980.

Robert F. Belovich, Parma, Ohio, for plaintiff.

Bryon S. Krantz and Karl E. May, Kadish, Krantz & Weiss, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

ANN ALDRICH, District Judge.

This matter is before the Court on a Motion for Summary Judgment filed by defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), and a Motion for Summary Judgment and to Dismiss for Want of Prosecution filed by defendant John E. Baumgarten (Baumgarten). Upon consideration of all the pleadings, answers to interrogatories, affidavits, and exhibits, and for the reasons set forth below, the Court grants summary judgment in favor of defendants.

Plaintiff Stephen A. Militsky (Militsky) filed his complaint on March 10, 1976, seeking $188,000 compensatory damages and $500,000 punitive damages for alleged violations by defendants of the federal securities laws. The jurisdiction of this Court is invoked under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10(b)5 promulgated under § 10(b) by the Securities Exchange Commission.

### I

Militsky is now retired from his employment with Clark Controller Company where he worked for 37 years as an Electrical Tester.

Defendant Merrill Lynch is an investment firm in Ohio, and defendant Baumgarten is a former employee of that firm.

The complaint alleges that Baumgarten, under the supervision of Merrill Lynch, recommended and induced Militsky to make excessive purchases and sales of securities with the aim of maximizing their commissions, to Militsky's detriment; that Merrill Lynch and Baumgarten engaged in extensive trading and churning disproportionate to the size of Militsky's account; that Merrill Lynch and Baumgarten acted in complete disregard of Militsky's rights and with knowledge that such frequent turnover of money was against his best interests; and that the churning of the account was so heavy, frequent and patternless that Militsky's interests were subordinated to defendants' principal aim of generating commissions, all with the resultant effect of depleting Militsky's account. In addition to his claims under the Securities Exchange Act, Militsky also alleges violations of the rules of the New York Stock Exchange and the National Association of Securities Dealers.

All of the parties acknowledge that under the law applicable to this case the complaint must have been filed within four years after actual or constructive discovery of the alleged fraud. Militsky concedes that his complaint was filed more than four years after the alleged churning took place, but contends that he did not, and could not have, discovered the fraud before April 11, 1972. Defendants contend that Militsky had actual knowledge of his claims more than four years prior to the filing of this action, as evidenced by his answers to interrogatories, and certain letters received by Merrill Lynch from Militsky.

Merrill Lynch filed a Motion for Summary Judgment contending that Militsky's suit is time-barred by the statute of limitations. Further, it is contended that there is no private right of recovery under the rules of the New York Stock Exchange and the National Association of Securities Dealers. Baumgarten's Motion for Summary Judgment asserts the statute of limitations and, in addition, seeks a dismissal pursuant to

Rule 41(b) of the Federal Rules of Civil Procedure, for want of prosecution because he was not served with process until late June, 1980—more than four years after the complaint was filed.

Because the Court finds that plaintiff's claims are time-barred by the statute of limitations, the remaining issues will not be addressed in this Memorandum Opinion.

## II

 In Ohio, the statute of limitations applicable to private actions under § 10(b) and Rule 10(b)5 of the Securities Exchange Act is the four-year period contained in the Ohio Revised Code, § 2305.09 for common law fraud. *Nickels v. Koehler Management Corp.,* 541 F.2d 611 (6th Cir. 1976). It is well settled that although the limitations period is determined by state statute, federal common law determines when the statutory period commences. It is equally well settled that the statutory period begins to run when the alleged fraud was, or should have been, discovered. *Gaudin v. K. D. I.,* 417 F.Supp. 620, 629 (S.D.Ohio 1976), aff'd, 576 F.2d 708 (6th Cir. 1978); *Vanderboom v. Sexton,* 422 F.2d 1233, 1240 (8th Cir.), cert. den., 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). The crucial question here then is whether Militsky actually discovered, or in the exercise of reasonable diligence, should have discovered the alleged fraud prior to March 10, 1972—the operative date for purposes of the statute of limitations.

## III

The facts of this case are set forth from plaintiff's point of view, giving him the benefit of all reasonable inferences, as is required on a motion for summary judgment.

Militsky, upon recommendation of a fellow employee at Clark Controller Company, opened an unmargined trading account (No. 646–17726[1]) with Merrill Lynch in 1941. In 1942, this account, which Militsky still maintains, was converted to a margin account. At the time he opened the account, Militsky's stated objective was to make money in the market and he was advised by Merrill Lynch that his stock would be traded in order to achieve that objective.

The Court notes that Merrill Lynch is the only brokerage firm with which Militsky has ever done business, and although he maintained an account with Merrill Lynch for over thirty years, he was not a sophisticated investor. In fact, it appears that Militsky was simply a hard-working, thrifty person, with an eighth grade education, who managed to accumulate and invest his savings over the years, and who relied heavily on his account executives at Merrill Lynch to help him make investment decisions.

Sometime in 1962, defendant Baumgarten was assigned by Merrill Lynch as Militsky's account executive, and remained in that position until September 1, 1971. At all times relevant herein, Baumgarten completely controlled the transactions in Militsky's account. Plaintiff explained to Baumgarten his objective of making enough money in the market so that he would have substantial income to supplement his retirement benefits. Baumgarten advised Militsky that he would continue trading stock for him, purchasing when stock was "moving", and selling before the price fell, and further instructed Militsky to telephone him twice daily, at specific times, so that Baumgarten could advise Militsky what stock to buy or sell.

At the time that Baumgarten took over the account in 1962, Militsky had a net investment equity of $54,600. By 1966, this equity had increased to $104,466. Over the next three years (1966–1969), Militsky's equity decreased to $55,823; and by 1971, the account had diminished to less than $4,000.

Throughout this period, Militsky was receiving monthly statements from Merrill Lynch. The account saw many short sales,

---

1. Militsky opened a second account (No. 646–46726) with Merrill Lynch in the name of his sister in March, 1965. He closed this account in April, 1978 and deposited the funds into Account No. 646–17726.

much in and out trading, and severe losses. During the period of the greatest losses, 1968–1971, Militsky on numerous occasions questioned Baumgarten as to what was happening and was repeatedly told by Baumgarten, "don't worry about it, trust me."

Sometime during the summer of 1969, Militsky communicated his concerns to Ross Kenzie, a vice president of Merrill Lynch. Kenzie wrote Militsky a letter, dated August 5, 1969, in which he indicated that he had discussed Militsky's account with Baumgarten, and he advised Militsky to contact him personally if Militsky felt at any time that Merrill Lynch had "slipped up". In response to this letter, Militsky wrote another letter to Kenzie, dated December 1, 1969, in which he informed Kenzie of his disappointment with Merrill Lynch and of the fact that he was "deeply in the red". He indicated that he had never been that "deep in the red" before and could not understand why; that he had deposited every dollar he could spare in the investment business over the years; and that at this time he had begun to bank his money since he had recently remarried and would be compelled to retire in two more years. With this letter, Militsky enclosed a copy of a letter and financial report, dated November 5, 1969, which he had received from Sherwin Goodman, a certified public accountant. Mr. Goodman's letter informed Militsky that he had checked each transaction from May 1, 1966 to September 30, 1969, and could find no mathematical error in Merrill Lynch's monthly statements. He further informed Militsky that his net worth had declined steadily from $104,466 to $55,823, and that Militsky's losses for October alone exceeded $17,000.

By letter dated December 5, 1969, Kenzie informed Militsky that he had reviewed his account and could understand why Militsky was concerned. He advised Militsky that "the market for the last two or three years" had been extremely difficult for individuals with Militsky's "trading" objectives, but assured Militsky that he would, over the next few months, become personally involved in assisting Baumgarten in overseeing Militsky's account, and in trying to improve his results. There was additional correspondence from Kenzie on January 29, 1970, and March 12, 1971, which are form letters and add nothing of substance to this matter.

After his account was almost totally depleted, Militsky met with Kenzie in September, 1971. At that time he was informed that Steven Spiegel had been assigned as his new account executive, and Spiegel informed Militsky that he would have to make up his losses on his own.

On March 6, 1972, Militsky wrote a letter to Donald Regan, President of Merrill Lynch, informing of the problems with his losses over the years and enlisting Regan's assistance. In response, Militsky received three letters from Merrill Lynch, dated March 14, 1972, March 27, 1972, and April 11, 1972, respectively. The first letter, from Robert De La Cruz, Manager of the Customer Service and Relations Department, indicated that Militsky's account would receive "immediate attention". The second letter, from Thomas Smith of the Law Department, informed Militsky that the matter would be "investigated". The third letter, also from Smith, advised that "better quality securities involving less risk" had already been recommended to Militsky, and that Mr. Kenzie would give Militsky's account "special care and supervision." [2]

## IV

Militsky contends that he was lulled into a false sense of security by Merrill Lynch and that he did not, and could not have, discovered the fraud or the fact that his account was being churned until he received the April 11, 1972 letter from Merrill Lynch, and learned that nothing was going to be done about his losses. With this, the Court simply cannot agree. The letter of

**2.** These letters between Militsky and Merrill Lynch were attached to the Briefs of the parties as exhibits.

April 11, 1972 was no more informative to plaintiff as to fraud or churning than any of the previous letters from Merrill Lynch.

■ While it may be true that Militsky did not have the experience and sophistication to understand that the volume of the transactions might have been excessive, or to understand the elements of a "churning" claim, as the Court stated in *Hupp v. Gray*, 500 F.2d 993, at 996 (7th Cir. 1974):

> ... It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute. *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969); *Laundry Equip. Sales Corp. v. Borg-Warner Corp.*, 334 F.2d 788, 792 (7th Cir. 1964). The plaintiff, rather, has the burden of showing that he 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.' *Morgan v. Koch, supra*, 419 F.2d at 997. The statutory period '[does] not await... [plaintiff's] leisurely discovery of the full details of the alleged scheme.' *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).

■ The Court has carefully reviewed the pleadings, answers to interrogatories, affidavits and exhibits filed by the parties, and the conclusion is inescapable that Militsky had sufficient information prior to March 10, 1972, to put him on notice that something was wrong, or at least that irregularities existed.

In his supplemental answer to Merrill Lynch's Interrogatory No. 28(b), Militsky stated that the alleged churning first came to his attention when Baumgarten handled his Fairchild Camera transaction at a loss in 1965. He further stated that in February, 1966, his accountant, Sherwin Goodman, informed him that he thought the account was being churned. In answer to Interrogatory No. 28(c), Militsky stated that once he concluded that churning was occurring, he complained to Baumgarten, and to his superior Ross Kenzie, and to Donald T. Regan.

In addition, Militsky's own exhibits (which include monthly statements from Merrill Lynch) show that he sustained substantial losses during the years 1966–1969.

That he was concerned about these losses is evidenced by the letter from his accountant indicating that he had checked the statements for errors. Moreover, Militsky was aware that he had sustained a $17,000 loss in October, 1969 alone. This information was sufficient to require a reasonable person to inquire into the possibility of wrongdoing. "Investors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must 'exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir. 1980), quoting *Hupp v. Gray, supra*, at 997.

Giving Militsky the benefit of all reasonable inferences, the Court notes that he did in fact attempt to ascertain what was happening with his account with Merrill Lynch. This is evidenced by the flurry of correspondence between Militsky and Kenzie and other representatives of Merrill Lynch. However, this went on for three years—from 1969 to 1972. During this period a reasonable person would have realized that he was getting no satisfaction from defendants, and would have taken his inquiry elsewhere. It is not sufficient that Militsky continued to inquire of the very persons he suspected of wrongdoing, for this is not the type of reasonable diligence contemplated by the courts. See generally, *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 486 F.Supp. 56, n.3 (E.D.No.1980). The Court finds that Militsky did not exercise reasonable diligence in seeking to learn facts which would uncover the alleged fraud in this case. He had a duty to inquire of someone other than defendants to ascertain the nature of his claims.

■ Plaintiff argues that because he comes before this Court as a naive and unsophisticated investor who has placed all of his financial resources and his trust in the defendants, that defendants should be estopped to assert the statute of limitations as a defense. There is no question that the application of the statute of limitations falls harshly on the plaintiff in this case. How-

ever, "statutes of limitations are vital to the welfare of society and are favored in the law." *Wood v. Carpenter*, 101 U.S. 135, 139, 25 L.Ed. 807 (1879). They "represent a pervasive legislative judgment that it is unjust to fail to put an adversary on notice to defend within a specified period of time and that 'the right to be free from stale claims in time comes to prevail over the right to prosecute them'". *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), *citing, Order of Railway Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). As was further stated by the Supreme Court, in *Kubrick, supra,* when upholding the harsh application of a federal statute of limitations:

> It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable. We should give them effect in accordance with what we can ascertain the legislative intent to have been. 100 S.Ct. at 361.

The Court further finds that the defendants' conduct did not induce Militsky to refrain from bringing suit; nor was there any fraudulent concealment of any facts from him which would give rise to any equitable tolling of the statute. See *Hupp v. Gray, supra,* at 996. Also see *Akron Presform Mold Company v. McNeil Corporation*, 496 F.2d 230 (6th Cir. 1974).

Accordingly, the Court finds that a reasonable person in Militsky's position, upon reasonable inquiry, should have discovered facts constituting the alleged fraud no later than March 6, 1972, the date of Militsky's letter to Donald Regan.[3] Therefore, the statute of limitations commenced to run on March 6, 1972. Inasmuch as Militsky's complaint was not timely filed, this action is barred by the statute of limitations.

---

**3.** In his Brief, counsel for Militsky concedes that by March 6, 1972, "Militsky arguably realized that he had been taken". There is just no reason that Militsky should have allowed his claims to slumber for four additional years before he filed this action.

There is no genuine issue of any material fact with regard to the statute of limitations, and Merrill Lynch and Baumgarten are entitled to judgment as a matter of law. Therefore, defendants' Motions for Summary Judgment are granted, and plaintiff's complaint is hereby dismissed.

IT IS SO ORDERED.