**AU RUSTPROOFING CENTER, INC.,**
**Plaintiff-Appellant, Cross-Appellee,**

v.

**GULF OIL CORPORATION,**
**Defendant-Appellee,**
**Cross-Appellant.**

Nos. 83–3635, 83–3669.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 22, 1984.

Decided Feb. 28, 1985.

Larry L. Inscore, argued, James De-Weese, Inscore, Rinehardt & Whitney, Mansfield, Ohio, for plaintiff-appellant, cross-appellee.

Philip Weaver, Jr., argued, Cleveland, Ohio, Keith E. Parks, The Gulf Companies, Houston, Tex., for defendant-appellee, cross-appellee.

Before EDWARDS * and KEITH, Circuit Judges, and JOHNSTONE, District Judge.**

---

* Hon. George Clifton Edwards took senior status January 15, 1985.

** Honorable Edward H. Johnstone, United States District Court for the Western District of Kentucky, sitting by designation.

KEITH, Circuit Judge.

This appeal arises from a breach of contract and fraud action tried before a jury in August 1983. Au Rustproofing Center, Inc. (Au), an Ohio based automatic carwash chain and gasoline retailer, brought suit against Gulf Oil Corporation alleging breach of contract and fraud. Gulf counterclaimed for a refund of unamortized loans it made to Au in connection with the contract. The jury returned a verdict awarding $53,000 to Au on its claims that Gulf failed to pay a special allowance rebate and price supports on the sale of gasoline to Au, and $132,000 to Gulf on its counterclaim. Au appeals the judgment rendered for Gulf and assigns reversible error to several of the trial court's rulings. Gulf conditionally cross-appeals and seeks review of two issues if Au prevails on its contract claims. We affirm in part, reverse in part and remand to the district court.

## FACTS

In 1971, Richard D. Au, president of Au Rustproofing Center, Inc., contracted to become a Gulf dealer for a period of ten years. The contract, in essence, obligated Au to exclusively sell Gulf petroleum products at Au carwash centers in Marion, Reynoldsburg and Mt. Vernon, Ohio, and at a proposed carwash in Delaware, Ohio. Gulf agreed to loan Au money for structural improvements and construction at the carwash centers and to subsidize some of Au's retailing and advertising costs.

The dealership contract consisted of several documents which were drafted by Gulf. For each site, Mr. Au signed a committal letter, affidavit and various reimbursement and sales agreements. At trial, Gulf described the committal letter as "a letter of understanding." In it, Au agreed to sign a ten year sales contract and an amortization agreement for the site improvement loans. The committal letter also stated Au's understanding that Gulf would provide marketing equipment and pay Au a special allowance of two cents per

gallon on all gasoline Au purchased from Gulf.

The affidavit assured Gulf that a competitor had also offered to pay Au the special allowance and loan improvement monies for each carwash center. Au further agreed in a sales contract to pay Gulf the tankwagon price for its gasoline, upon delivery each week. The sales contract provided no restriction on Gulf's discretion to set the tankwagon price.

The last major document of the contract, the Reimbursement Agreement, provided terms for reimbursement of the site improvement loans. Under it, Au's obligation to repay the balance of the site improvement loans automatically arose upon Au's breach of the ten year sales contract:

[I]n the event the said Sales Agreement is terminated prior to the normal expiration of the terms therein by reason of [Au's] failure or refusal to abide by all the terms and conditions, ... then [Au] shall reimburse [Gulf] for its cost for the following work and improvements done ... on [Au's] premises less ten percent of [Gulf's] total cost for each [year] during which [Au] has performed the Sales Agreement.

Joint Appendix at 143-46.

Upon execution of these documents, Gulf paid Au improvement costs for each of the carwash centers. Two of the four centers began selling Gulf gasoline by mid-1971. One opened in late 1971, and the Delaware center, which had to be constructed and equipped, opened in January 1972. The first few months of business comported with the terms in the agreement. Au bought and paid weekly for the requisite amount of Gulf gasoline; Gulf provided Au with the special allowance, competitive subsidies and a portion of the opening advertising costs.

The initial success of these first four centers prompted Gulf and Au in early 1972 to open three additional carwash dealerships in Newark, Heath and Mansfield, Ohio. Gulf again agreed to provide construction and site improvement loans for each location. However, the loan reim-

bursement provisions which Gulf drafted for these sites differed from those signed in connection with the first four sites. Instead of amortizing the site improvement loans at the straight ten percent a year rate agreed upon for the first four locations, Gulf amortized the new loans at .89¢ per gallon of Gulf gasoline bought by Au. Gulf also added a provision for written notice of termination before Au's obligation to repay the loans arose. The new reimbursement contract, entitled Provisional Payback Agreement, obligated Au to:

(1) [P]urchase 6,600,000 gallons ... in substantially equal monthly quantities from _____ to _____ ... In the event [Au] fails to purchase the above minimum in the period specified, it will continue to purchase until the minimum is attained. (2) That in the event [Au] fails to purchase the minimum requirements as specified ... or fails to purchase any ... for a period of ninety (90) consecutive days or more, or in the event [Au] breaches any other agreements with Gulf, Gulf may at its option terminate all agreements between Gulf and it by giving ten (10) days prior written notice of Gulf's election to do so, in which event it shall pay to Gulf ...:

A. The sum of _____ ... reduced by the number of gallons purchased since October 4, 1972 times ... per gallon....

Joint Appendix at 59, 64, 69. In April 1972, Au signed the Provisional Payback Agreement. Au alleged that it then authorized Gulf to use its blank stationery to prepare three new committal letters in accordance with those drafted for the first dealerships. Mr. Au testified at trial that, at Gulf's behest, he presigned some of the blank stationery requested by Gulf.

The committal letters for the new sites differed from the first letters in that they required Au to give second mortgages on its equipment as security and a first right of purchase refusal. Au nonetheless proceeded with construction plans for the new sites. In July 1972, however, Gulf demanded the additional security before it would disburse the loan money to Au. After extended renegotiation, Au acceded to Gulf's demand for additional security. In November 1972, Mr. Au secured the loans with second mortgages on Au property. Au opened the Mansfield dealership in December 1972, the Newark center in January 1973, and the Heath center in February 1973.

Au and Gulf abided by the terms of the contracts until the May 1973 oil crisis ruptured the market and gave rise to federal regulation of the industry and soaring gasoline prices. At that time, Gulf ceased paying the special allowance and all competitive subsidies for four months, resulting in a $15,000 loss to Au. Au's gasoline prices became increasingly uncompetitive and its gross margin began to decline.

In September 1973, the Federal Energy Department ordered Gulf to resume special allowance payments. Gulf complied but did not make up for payments missed during the four month hiatus. Gulf also never reinstated any of the competitive subsidies. Throughout 1973, gasoline prices rose. Au's gross margin, however, continued to decline. During this time, unleaded gasoline was introduced to the market. Although gasoline retailers were required to sell it, Gulf refused to provide Au with tanks, marketing equipment or a special allowance for the unleaded gasoline. As a result, Au was compelled to sell Gulf's unleaded gasoline in place of the premium Gulf gasoline. From 1973 through 1978, Au repeatedly requested that Gulf pay the special allowances missed during the four month hiatus and those for the unleaded gasoline Au began selling in 1974. Gulf issued several conflicting assurances and denials that the allowance would be paid. Gulf finally responded to Au's request in a letter which denied that Gulf was obligated to continue special allowance payments. The letter, addressed to Au's attorney and dated June 28, 1973, suggested Au had agreed in an affidavit that Gulf could unilaterally suspend the allowances:

Your attention is directed to the affidavits of April 27 and 28, 1972, in which your client states in Paragraph 4 thereof

that it is "expressly understood that Gulf shall have the right to withdraw or discontinue such payments (in whole or in part) at any time or from time to time during the term of such contract without notice."

Joint Appendix at 141. Throughout 1974–1978 Au's gross margin declined as did the volume of gasoline Au was able to purchase from Gulf. In November 1980, Gulf terminated Au without notice for failure to pay $7,000 for a shipment of gasoline.

In March 1979, Au filed a complaint in the United States District Court for the Northern District of Ohio alleging that Gulf breached the contract by refusing to pay the special allowance on regular and premium gasolines during the four month hiatus or on any unleaded gasoline; by refusing to provide cooperative advertising allowances, competitive price supports, marketing equipment and gasoline volume reports; and by refusing to accept collect telephone calls. Au also alleged fraud. In this respect, Au contended that Gulf acquired presigned blank stationery from Au in order to fraudulently draft several affidavits which absolved Gulf of its obligation to pay Au the special allowance.

The trial court denied Gulf's motions for summary judgment, but directed verdicts for Gulf on five of Au's eight claims. The following issues were submitted to the jury: Gulf's counterclaim for the balance of the unamortized loans, and Au's claims that Gulf failed to pay (1) the special allowance on regular and premium gasoline from May 1973 to September 1973; (2) the special allowance rebate on unleaded gasoline from July 1974 until Gulf terminated the contract in 1980; and (3) the competitive price supports.

## DISCUSSION

On appeal, Au challenges the judgment for Gulf and assigns several errors to the trial court. We first address Au's arguments against the judgment for Gulf on its counterclaim. Au contends that Gulf is estopped from asserting the counterclaim because Gulf caused the financial demise which gave rise to Au's breach and liability to repay the loans. In essence, Au argues that by failing to pay Au the special allowance and by refusing to keep Gulf dealers competitive, Gulf failed to substantially perform under the contract and also impermissibly prevented Au from so performing.

We find this argument unpersuasive. The basic principles of contract law that a party seeking recovery must first show its own substantial performance and that a party who causes another's nonperformance cannot recover therefrom, are of no avail to Au. First, in viewing the many contracts in the record we do not find that Gulf made a binding promise to keep Au competitive in the gasoline retailing market for ten years. Au concedes that the special allowance is mentioned only in the affidavits and committal letters signed by Au. Au also concedes that none of the documents restricts Gulf's discretion to set the tankwagon price, obligates Gulf to sell gasoline to Au at competitive prices or otherwise establishes Gulf's liability for failure to keep Au competitive. Gulf is not required to show substantial performance of a duty it was not bound to carry out before it can assert the counterclaim. Similarly, although Gulf assumed the implied duty of a party controlling the price to set a reasonable price, *see* Ohio Rev.Code Ann. § 1302.18(B) (Page 1979); *see generally*, 1.A. Corbin, *Corbin on Contracts*, § 98 (1963), the record does not establish that the high price Gulf charged to Au was so unreasonable that it negated Gulf's substantial performance of the implied duty.

Under Ohio law, Gulf is required to fix a price in good faith. Ohio Rev. Code Ann. §§ 1302.01(A)(2) official comment 4; 1302.-18(B) official comment 3 (Page 1979). Good faith includes observance of reasonable commercial standards of fair dealing in the trade or the general range of market prices. Ohio Rev.Code Ann. § 1302.-01(A)(2). Au contends that because its competitors sold gasoline for less than Au could buy it from Gulf, Gulf's prices were unreasonable. Appellant's Brief at 26. In our view, this contention is insufficient to

establish that prices set by Gulf contravened reasonable commercial standards in the gasoline market or otherwise constituted bad faith or commercially unreasonable behavior. *See Columbia Gas Transmission v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 23 (S.D.Ohio 1977). Thus, Au's argument that the counterclaim is precluded because Gulf failed to substantially perform the implied duty to set reasonable prices is unsubstantiated. In addition, Gulf neither promised nor was required to show that it kept Au competitive with other gasoline retailers before Gulf could recover on the counterclaim.

■ Au's argument that Gulf is estopped from asserting the counterclaim because it caused Au's financial decline and the resulting breach is equally unavailing. We do not conclude that Au's financial decline was necessarily proximately caused by Gulf's refusal to pay competitive subsidies. Several factors, including the 1973 oil embargo and the ability of other companies to sell gasoline more cheaply through company outlets, would permit the jury to conclude that Au's decline was caused by multiple factors. On this record, therefore, it was not unreasonable for the jury to conclude that Gulf did not proximately cause Au to breach the sales contract.

■ Au next challenges the counterclaim judgment by arguing that the $53,000 judgment awarded to Au on its special allowances claim negated the unpaid $7,000 gasoline bill which gave rise to Au's breach. Under this theory, Au's breach, which gave rise to its duty to repay the loans, did not occur because the $7,000 Au owed to Gulf would have to first be setoff against the $53,000 Gulf was later found to owe Au. We find no merit in this argument. Au's theory rests on two assumptions: (1) the agreement to pay weekly for gas delivered and the agreement to pay a special allowance are dependent covenants; and (2) the procedural remedy of set-off can negate a substantive contract cause of action. We find neither assumption correct. In our view, Au's agreement to pay for gasoline on delivery is not conditioned upon Gulf's agreement to pay a special allowance. The agreements are independent elements of the overall dealership contract. Under Ohio law, Au must incur damages resulting from an established breach of the sales contract before it can deduct anything from the gasoline price it owed Gulf under the same contract. *Columbia Gas Transmission v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 20 (S.D.Ohio 1977); Ohio Rev. Code Ann. § 1302.91 official comment 1. The sales contract and the agreement to pay a special allowance are independent provisions; the breach of one does not entitle Au to "adjust its continuing contract obligations according to the equities" as it perceives them. *Columbia Gas Transmission v. Larry H. Wright, Inc.*, 443 F.Supp. at 20. Thus, given this series of agreements, the $7,000 Au failed to pay Gulf is unaffected by the $53,000 loss Au sustained from Gulf's breach of the special allowance agreement. Further, the only procedurally proper set-off in this case would be one setting off the judgments of $53,000 and $132,000.

■ Au's third argument against the counterclaim is based upon the terms of the Provisional Payback Agreements which Gulf drafted for the last three dealerships. Au contends that Gulf's right to recover on the counterclaim was precluded by its failure to satisfy the condition precedent requiring ten days written notice prior to termination of the contract. We agree.

The Provisional Payback Agreement expressly conditions Au's obligation to repay the loans upon ten days prior written notice by Gulf. The record shows no evidence that any notice was given. Gulf does not contend that it served notice, but argues that Au waived this argument by failing to raise it below. We do not agree. Au's response to Gulf's counterclaim generally disputes all underlying elements of the counterclaim, including Gulf's contention that the agreements between the parties had been terminated pursuant to their terms. We find this response sufficient to put in dispute Gulf's right to recover on the counterclaim.

It is well established under Ohio contract law that a party must comply with all express conditions to be performed in case of breach before it can claim damages by reason of the breach. *Bell Brothers v. Robinson*, 5 Ohio App. 454, 458 (Ohio Ct. App.1916). A right of action requiring notice as a condition precedent cannot be enforced unless the notice provided for has been given. 18 O.Jur.3d Contracts § 210 (1980); 17 Am.Jur.2d Contracts § 356 (1964); 3a A. Corbin, *Corbin On Contracts*, § 727 (1960). In this case, strict adherence to the terms of the Provisional Payback Agreement is particularly appropriate since Gulf drafted these documents. Accordingly, the judgment awarded on Gulf's counterclaim for repayment of loans for site improvements at the Newark, Mansfield and Heath centers is reversed.

We next address Au's allegations of trial court error. In its remaining issues, Au assigns several errors to the various rulings of the trial court. Au first argues that the court erred in directing a verdict for Gulf on Au's claim of fraud. Au had alleged in its complaint that in April 1972 Gulf requested presigned blank pages of Au's stationery. Au provided the stationery with the understanding it was to be used in preparing committal letters for the last three car wash dealerships. Au alleged that several of the presigned sheets of stationery were instead used by Gulf to create affidavits granting Gulf unilateral power to suspend special allowance payments without notice. Au contended it did not discover these fraudulent affidavits until March 1980, even though Gulf had expressly referred Au's attorney to them in a letter dated June 1973. The trial court found that Au should have known about Gulf's alleged fraud from the June 1973 letter. The court calculated the four year statute of limitations for fraud from that date and ruled the claim was time barred. *See* Ohio Rev.Code Ann. § 2305.09 (Page 1979). The court then directed a verdict for Gulf on this claim.

■ Although the record contains substantial circumstantial evidence of fraud, we are unable to find error in the court's judgment. Under Ohio Revised Code § 2305.09, a cause of action for fraud must be brought within four years after the fraud was or should have been discovered. No more than a reasonable opportunity to discover the fraud is required to start the period of limitation. *Gaudin v. K.D.I. Corp.*, 417 F.Supp. 620, 629 (S.D.Ohio 1976), *aff'd*, 576 F.2d 708 (6th Cir.1978). Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence. *Militsky v. Merrill, Lynch, Pierce, Fenner and Smith*, 540 F.Supp. 783, 787 (N.D.Ohio 1980). Once sufficient indicia of fraud are shown, a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false sense of security to toll the statute. *Id.* at 786–87.

■ The June 1973 letter was clearly sufficient information to trigger Au's obligation to discover the alleged fraudulent use of its stationery. Au failed to assert its fraud claim within four years of the date it received the letter, the date by which it should have discovered Gulf's alleged fraud. The judgment of the district court on this claim is accordingly affirmed.

■ Au next contends that the trial court erred in directing a verdict for Gulf on Au's claim that Gulf breached its obligation to provide a cooperative advertising allowance. The facts giving rise to this claim are briefly outlined as follows. At the time Mr. Au became a Gulf dealer, Gulf sponsored a cooperative advertising program for its dealers. Under the program, Gulf provided dealers with matching advertising funds of $\frac{2}{10}$ cent per gallon of gasoline bought by the dealers. Au alleged that its dealership agreement included participation in the advertising program and that Gulf's failure to pay the allowance over the years had caused $34,000 in damages. The trial court directed a verdict on this claim for Gulf on the ground that Au had presented insufficient evidence of damages.

Viewing the evidence presented most favorably toward Au, we do not agree with the trial court that Au fails to sufficiently support its claim or that the evidence sustains only a conclusion in favor of Gulf. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir.1983). Au submitted proof that (1) the cooperative advertising program existed; (2) the advertising allowance was discussed as part of the dealership contract; (3) Au applied for the allowance; (4) based on the payment formula, Au's purchase of over seventeen (17) million gallons of gasoline from Gulf entitled it to $34,000. (5) Gulf's failure to pay the allowance resulted in over $34,000 in losses for Au. This is sufficient evidence to raise a jury question of whether Au was entitled to recover on its cooperative advertising allowance claim, and if so, how much. The judgment on this claim is reversed and this issue is remanded to be submitted to the jury for appropriate determination.

■■■■ On cross-appeal, Gulf contends the trial court erred in not finding that Au's claims for the special allowance during the four months of 1973, and for the cooperative advertising allowance were time barred under the Ohio Uniform Commercial Code's four year statute of limitation. *See* Ohio Rev.Code Ann. § 1302.02 (Page 1979). Gulf argues that since its contract with Au was one for the sale of gasoline, the U.C.C. limitation period should apply to Au's claims of breach. This argument has no merit. The primary purpose of the agreements between Gulf and Au was to establish Au as a Gulf dealership. The contract involving the sale of gasoline was but one of many documents in the overall contractual package and does not warrant finding the entire agreement as one predominantly for sale of goods. Further, Au primarily sought relief under provisions of the deal-

ership agreement, repayment agreements, and agreements to provide support services. The trial court judgment on this issue is affirmed.

■■■■ In the second issue on cross-appeal, Gulf objects to the admission of testimony from Au's accounting expert. Gulf contends the expert's opinion that Au would have survived had Gulf not breached the special allowance agreement, was inadmissible under Federal Rule of Evidence 703 [1], because the opinion was based on data not relied upon by other accounting experts. Au's expert testified that his opinion was based on profit margin comparisons between Au and two service stations in neighboring towns. We find no abuse of discretion in the court's decision to admit this testimony. Gulf offers no evidence that these comparisons are not the type relied upon by accounting professionals. In fact, Gulf's accounting expert also based his opinion on a sample of profit margins for service stations in different cities across the country.

In sum, the judgment on Gulf's counterclaims for the Newark, Heath and Mansfield centers is reversed with appropriate sums to be deducted from the award; the directed verdict for Gulf on Au's advertising allowance claim is reversed and remanded to be submitted to a jury. All other judgments are affirmed.

■■■■■■

---

**1. Rule 703. Bases of Opinion Testimony by Experts.**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.