MICHIGAN UNITED FOOD AND COM-
MERCIAL WORKERS UNIONS AND
DRUG AND MERCANTILE EMPLOY-
EES JOINT HEALTH AND WELFARE
FUND, Plaintiff–Appellant,

v.

The MUIR COMPANY, INC., An Ohio
Corporation; and Rite Aid Corporation,
A Delaware Corporation, Defendants–
Appellees.

No. 92–1725.

United States Court of Appeals,
Sixth Circuit.

Argued March 23, 1993.

Decided April 20, 1993.

Andrew Nickelhoff (briefed), Theodore Sachs (argued and briefed), Reginald M. Turner, Jr. (briefed), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, MI, for plaintiff-appellant.

William H. Fallon (argued and briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for defendants-appellees.

Before: KENNEDY, MARTIN and MILBURN, Circuit Judges.

MILBURN, Circuit Judge.

Plaintiff Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund appeals from the summary judgment for defendants, Muir Company, Inc. ("Muir"), and Rite Aid Corporation ("Rite Aid"), in this action to collect allegedly delinquent welfare funds contributions from defendants pursuant to the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1145. On appeal, the principal issue is whether this action is barred by the applicable Michigan statute of limitations. For the reasons that follow, we affirm.

## I.

Defendant Muir operated a chain of drug stores in Western Michigan until June 1984 when Rite Aid acquired Muir by purchasing its stock. The Muir stores were governed by two collective bargaining agreements between Muir and various local unions of the United Food and Commercial Workers Union. Under these agreements, Muir made contributions on behalf of the employees to the United Food and Commercial Workers International Union Industry Pension Fund ("Pension Fund") and the Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund ("Welfare Fund"). The Welfare Fund is a multi-employer welfare benefit plan as defined in 29 U.S.C. §§ 1002(1) and (37). The Pension Fund is a multi-employer pension plan as defined in 29 U.S.C. §§ 1002(2) and (37). Both Funds were located in the same building at the headquarters of United Food and Commercial Workers Union Local 876 in Madison Heights, Michigan. Although each Fund had its own board of trustees and staff, they shared a common manager, Jimmie Foster. Each Fund received contributions from seven different employers.

During routine business operations, each Fund generated a monthly invoice for each employer. The relevant monthly Welfare Fund invoice was a computer printout showing the names of each employee for whom Muir had made a contribution for the preceding month. It listed a premium charge for each of the employees that varied according to whether the employee worked full-time or part-time.

The collective bargaining agreements required Muir to pay a Welfare Fund contribution for each employee who was on the payroll as of the first day of the month. When an employee quit or was terminated, Muir had no further obligation to contribute to the Welfare Fund on his behalf. If an employee was laid off, however, the agreement required a contribution for the month following the date of the layoff. It also required contributions for employees on sick leave for as long as six months. The invoice included codes for the employer to report changes in employee status such as might affect the contribution on his or her behalf. Because Muir was required to return the invoice with full payment by the 15th day of the covered month, personnel actions occurring during the latter half of the month could not be represented.

Pension Fund invoices, on the other hand, were sent to Muir's payroll department

which entered on them the actual number of hours worked by each listed employee during each week of the month. Muir returned this form to the Pension Fund, together with the requisite contribution for the reported employee hours, by the 15th day of the following month. The invoice could be modified by Muir to reflect the addition of new personnel or changes in an employee's status.

When the Funds received the completed invoices ("employer reports") from Muir, each Fund entered the data into the same computer system, which could at any time thereafter regenerate the data. According to the manager of both Funds, Jimmie Foster, there was only one billing department which posted both the welfare and pension fund contributions to the appropriate account. Because all the pension and welfare fund data was contained in the same database, although possibly in separate computer files within it, the data from the employer reports concerning an employee's status at Muir could be easily cross-checked.

During 1983, the Funds conducted an audit of Muir's contributions for a period of time ending in December 1982. That audit discovered routine billing and paying errors having to do with employee status and resulted in the payment by Muir of a substantial deficiency.

In June 1984, Rite Aid acquired 100 percent of the capital stock of Muir. Muir remained in existence at all times following the acquisition of its stock, operating under the assumed name of Rite Aid Pharmacy and filing Michigan Annual Reports with the Michigan Corporations Bureau for each year thereafter. The Annual Report for 1989 showed that Muir had assets and net worth in excess of the amount claimed in this action.

In June 1989, approximately five years after Rite Aid's acquisition of Muir, the Funds began an audit of the employers' fund contributions going back to January 1983. There is no dispute about Rite Aid's fund contributions during the period after its acquisition of Muir: the audit revealed contribution deficiencies of $17,866.88 for the post-

acquisition period which Rite Aid promptly paid.

As for the pre-acquisition period from January 1983 through June 1984, the Funds determined that Muir had underpaid its contributions by a total of $19,993.12.[1] The Funds arrived at this conclusion by comparing the data from Muir's monthly contribution reports to each fund and identifying errors in hours worked, employee status, and contributions paid by Muir. In the ordinary course of an audit, the discrepancies identified by this "internal audit" would be checked against the employer's personnel records to confirm or refute the apparent discrepancies. With respect to the pre-acquisition period, the Funds were unable to perform this second part of the audit because Rite Aid had destroyed Muir's personnel records in July or August 1989 pursuant to its normal document retention and destruction routine.

On June 23, 1989, Rite Aid's Senior Vice President of Personnel, Robert Souder, wrote to advise the Funds that Rite Aid did not have Muir's personnel records for the pre-acquisition time period. Souder's letter also incorrectly stated that Rite Aid had acquired Muir by means of an asset purchase rather than a stock purchase. In a subsequent letter of March 27, 1990, Rite Aid admitted that it was unable to provide documentation that the acquisition had indeed been an asset purchase. The Funds then conducted their own investigation into the nature of the acquisition and discovered that it had been structured as a stock purchase. Prior to a letter of inquiry on November 10, 1989, the Funds had never inquired about the nature of Rite Aid's acquisition of Muir, although, of course, they were aware of it from the moment it took place in 1984.

In April 1990, the Funds' auditors, using the information stored in the computer, prepared an estimated calculation of Muir's underpayments for the period January 1983 through June 1984. The discrepancies discovered by this internal audit were of various kinds, caused mainly by misreporting an employee's status as part-time or full-time, recently hired or terminated, or laid off or on

---

1. The Welfare Fund's alleged deficiency was $19,069.97.

sick leave. The misreporting was not caused by any particular systemic error in the reporting system used by Muir, and the parties agree that the errors were common and unintentional.

In August 1990, three multi-employer benefit funds [2] filed this action to recover alleged employer underpayments to the Funds pursuant to §§ 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1145. On cross-motions for summary judgment, the district court held that the Funds' claims had accrued no later than July 15, 1984, more than six years before the funds filed suit in August 1990, and were therefore barred by the applicable Michigan statute of limitations, Mich.Comp.Laws Ann. § 600.5807(8). From a judgment in favor of the defendants, only the Welfare Fund has appealed.

## II.

### A.

■ The Welfare Fund argues that the district court erred in granting summary judgment to the defendants. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56. A district court's grant of summary judgment is reviewed de novo. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). In its review, this court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987).

In concluding that the six-year statute of limitations had run in this case, the district court relied upon the "discovery rule" and held that

> [i]n an ERISA action for alleged underpayment of employer contributions, a claim accrues and the limitations period begins to run when the "plaintiff discovers, or

with due diligence should have discovered, 'the injury that is the basis of the action.' " *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C.Cir.1991) (citing *Northern California Retail Clerks Unions and Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.,* 906 F.2d 1371, 1372 (9th Cir.1990)). Since it is undisputed that the Funds did not have actual knowledge of their causes of action until April 1990 [when the audit was completed], the relevant issue is when the Funds should have become aware of Muir's delinquencies and false reports.

J.A. 24. Applying this standard, the district court found that

> the statute of limitations accrued no later [than] February 15, 1983 as to the January 1983 contributions, and each subsequent cause of action accrued monthly thereafter. At these times, as stated *supra,* the Funds received monthly reports that they knew from experience contained likely discrepancies. Thus, when they received the monthly reports, the Funds reasonably should have become aware of the type and nature, if not the magnitude, of their injuries.

J.A. 24–25.

■ The parties agree that the discovery rule is applicable in this case. Although this circuit has not directly ruled on the applicability of the discovery rule to this kind of employer contribution case under ERISA, there is ample authority outside this circuit for applying the rule. *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1282 (3d Cir.1991); *Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336, 343 (D.C.Cir. 1991); *Connors v. Beth Energy Mines, Inc.,* 920 F.2d 205, 212 (3d Cir.1990); *Northern California Retail Clerks Unions and Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.,* 906 F.2d 1371, 1372 (9th Cir.1990); *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 46 (3d Cir.1990).

There is good reason for us now to adopt and apply the discovery rule in this ERISA

---

2. The three Funds were the Michigan United Food and Commercial Workers Unions and Drug and Mercantile Joint Pension Fund, the Michigan United Food and Commercial Workers Union and Drug and Mercantile Employers Joint Health and Welfare Fund, and the Michigan United Food and Commercial Workers International Union–Industry Pension Fund.

case because we have frequently done so in other contexts. *Dixon v. Anderson,* 928 F.2d 212, 215 (6th Cir.1991) (42 U.S.C. § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury"); *Friedman v. Estate of Presser,* 929 F.2d 1151, 1159 (6th Cir.1991) (plaintiff in *Bivens* action has reason to know of his injury when he should have discovered it); *Hofstetter v. Fletcher,* 905 F.2d 897, 904 (6th Cir.1988) (RICO action accrues when plaintiff knew or should have known of defendant's fraudulent scheme); *Au Rustproofing Center, Inc. v. Gulf Oil Corp.,* 755 F.2d 1231, 1237 (6th Cir.1985) (state fraud action accrues when the fraud was or should have been discovered); *Shapiro v. Cook United, Inc.,* 762 F.2d 49, 51 (6th Cir.1985) (per curiam) (statute begins to run when claimant discovers or should have discovered violations of National Labor Relations Act); *Modin v. New York Cent. Co.,* 650 F.2d 829, 834 (6th Cir.) (statute of limitations governing malpractice claim under Federal Tort Claims Act begins to run when claimant discovers or should have discovered the acts constituting the alleged wrong), *cert. denied,* 454 U.S. 967, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981) (statute in securities fraud case begins to run when the fraud should have been discovered); *Ott v. Midland–Ross Corp.,* 600 F.2d 24, 27 (6th Cir.1979) (Age Discrimination in Employment Act claim accrues within a reasonable time after plaintiff should have discovered injury); *N.L.R.B. v. Allied Products Corp.,* 548 F.2d 644, 650 (6th Cir.1977) ("general rule" is that statute begins to run when claimant discovers or should have discovered the unfair labor practice).

■ Although the statute of limitations may be borrowed from state law, it is federal law that determines the date on which a statute of limitation begins to run. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *Hallmark &*

*Son Coal Co.,* 935 F.2d at 341; *Dixon,* 928 F.2d at 215; *Northern California Retail Clerks Unions,* 906 F.2d at 1372; *Herm,* 663 F.2d at 682.[3]

■ In our application of the discovery rule to this case, the central question is when the Welfare Fund should have become aware of Muir's underpayments. The Welfare Fund argues that it had no particular and specific reason to doubt the accuracy of Muir's reports until it completed its audit in April 1990 and that the six-year statute of limitations should have begun to run from that point in time. In support of its argument, the Welfare Fund relies on *Sheet Metal Workers, Local 19,* 949 F.2d at 1282, in which the Third Circuit held that a union's welfare and pension fund's failure to audit employer contributions did not amount to a lack of due diligence under Pennsylvania's discovery rule.

> We agree with the district court that the plaintiffs' failure to audit did not cause the statute of limitations to run again. As the district court found in rejecting [the employer's] audit argument,
>
>> The collective bargaining agreements contemplated a self-reporting system and certification for the obvious purpose of vitiating the need for constant and disruptive audits of the employer's records by plaintiffs.
>
> *Id.*
>
> The court further explained that
>
>> [a] plaintiff, however, cannot be expected to exercise diligence unless there is "some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence."

*Id.* (quoting *Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268, 1273 (3d Cir.1987)). Taking its cue from *Sheet Metal Workers, Local 19,* the Welfare Fund argues that it had no special reason to "awaken

---

**3.** It should be borne in mind during the ensuing discussion that the three Third Circuit cases mentioned, *viz., Sheetmetal Workers Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274 (3d Cir.1991); *Connors v. Beth Energy Mines, Inc.,* 920 F.2d 205 (3d Cir.1990); and *Vernau v. Vic's Market, Inc.,* 896 F.2d 43 (3d Cir.1989), all apply Pennsylvania tolling principles, as well as the Pennsylvania statute of limitations, to their discussions. Thus, the Third Circuit apparently follows a rule different from the rule in this circuit. In this case, neither party argues that Michigan tolling principles should apply.

inquiry" and that, no alarm having sounded, it did not fail the diligence test.

Defendants counter with the argument that the Welfare Fund knew from its previous audit in 1983 that Muir's monthly reports would contain a variety of discrepancies and that, because these discrepancies were ascertainable by comparing the monthly reports submitted to the Welfare Fund with those submitted to the Pension Fund, as was actually done to determine the deficiencies at issue in this case, the Welfare Fund had within its power the ability to detect probable discrepancies within a month after the filing of the monthly reports. Therefore, defendants argue that the Welfare Fund's failure to perform such a comparison before April 1990 indicates a lack of reasonable diligence.

Defendants rely on *Beth Energy Mines, Inc.*, 920 F.2d at 212, in which the Third Circuit held that fund trustees could not avail themselves of the benefits of the discovery rule to toll the statute of limitations because bi-weekly magnetic tape reports furnished to the funds by the employer showed that the employer had changed its accounting system for lunch hours worked by employees. The court found that "these tapes were sufficient to put the Trustees on notice of claims based upon the misreporting of worked lunch hours." *Id.*

Defendants also rely on *Vernau*, 896 F.2d at 46, in which the Third Circuit refused to allow ERISA benefit plan trustees the advantages of the discovery rule in an action to recover employer contributions where the employer's monthly reports showed on their face that the company had exceeded the bargaining agreement's 10 percent limit on a certain class of exempted employees for whom no fund contributions were to be made. The court held that a reasonably diligent agent for the Funds would have performed the simple calculation necessary to determine whether the reported number of exempted employees exceeded 10 percent of all employees, and it therefore held that the applicable statute of limitations began to run from the time the reports were submitted.

In the two other cases discussed by the parties, *Jumbo Markets* and *Hallmark*, the Ninth Circuit and the D.C. Circuit, respectively, affirmed the discovery rule as the federal tolling principle applicable to ERISA actions for underpayment of employer contributions. In neither case, however, did the court reach the question of whether the funds had acted diligently to discover employer errors in reporting. Instead, both courts remanded the cases to the district courts for findings on the funds' due diligence.

From the foregoing authorities, it is apparent that the crucial question in this case is whether the Funds had sufficient notice of probable discrepancies in the employer's contribution reports that the concept of due diligence required them to investigate long before they did. Favoring the Welfare Fund is the fact that the employer's mistakes in this case were various and not the result of a single systemic error as, for example, occurred in *Beth Energy*, where the accounting system for worked lunch hours was changed to the Funds' detriment. With this distinction in mind, it would be possible to find that the Welfare Fund had no "reason to awaken inquiry" and that its failure to perform an earlier audit did not amount to a lack of due diligence. *Sheet Metal Workers, Local 19*, 949 F.2d at 1282.

On the other hand, the facts in this case show that the Funds, by conducting an internal audit using information already within their possession, had the ability to discover probable discrepancies and underpayments at any time after the employer's monthly reports were received. It was by this very method that the Funds obtained the information necessary to support this action. Furthermore, the Funds knew from their previous audit in 1983 that these kinds of employers' errors were likely to occur and that only an audit could discover them. Thus, this situation is different from one in which the funds are chargeable only with the general knowledge that "to err is human." Here the Funds are chargeable with the particular knowledge that *these* mistakes are made. They are also chargeable with the knowledge that a review of their own records would disclose these mistakes. If the Fund in *Beth Energy* should have discovered the unpre-

dictable change in accounting for worked lunch hours, and if the Fund in *Vernau* should have made the "easy calculation" that would have shown a violation of the bargaining agreement's ceiling on exempted employees, then the Funds in this case, anticipating the very errors that occurred and possessed of the means to detect them, should have discovered them long before they did.

■ In defining the concept of due diligence, this court has "looked to what event should have alerted the typical lay person to protect his or her rights." *Dixon*, 928 F.2d at 215 (civil rights action under 42 U.S.C. § 1983). It is notable that the Welfare Fund in this case was hardly in the position of a "typical lay person." Instead, the Funds' auditors were experts in the accounting methods required to detect the kinds of employer reporting errors involved in this case, they had detected similar errors previously in their 1983 audit, and they anticipated that unintentional errors of these kinds would inevitably recur. Compared to the typical lay person, the Welfare Fund had superior personnel and equipment with which to detect foreseeable employer error.

■ In fraud cases, which are somewhat analogous to the present case in that misrepresentation or concealment of error is often involved, this court has imposed "a positive duty to use diligence in discovering the existence of a cause of action." *Herm*, 663 F.2d at 682. We have held that

> [i]nformation sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's *duty to inquire* into the matter with due diligence.

*Au Rustproofing Center*, 755 F.2d at 1237 (emphasis added). Under the particular facts of this case, the Welfare Fund had a duty to inquire into the possibility of errors in employer monthly reports because it knew that such errors would occur. That knowledge distinguishes this case from *Sheet Metal Workers, Local 19*, in which the Third Circuit held that the plaintiff funds "had no reason to awaken inquiry." In *Sheet Metal Workers, Local 19*, the question was whether the employer had underreported the hours worked by two employees, both of whom worked for two different but related corpora-

tions. 949 F.2d at 1276. The facts in *Sheet Metal Workers, Local 19* indicate that the fund could not reasonably have predicted the kind of misreporting that occurred there. In the present case, however, the Welfare Fund could predict and anticipate the very errors that occurred, and it possessed both the data and the qualified personnel necessary to detect those errors by the rather simple process of comparison. Its failure to detect the errors until the audit of 1990 is attributable to a lack of diligence. Therefore, the statute of limitations was not tolled, and, as the district court held, the causes of action accrued and the statute of limitations began to run when Muir's pension and welfare fund reports came into the hands of the funds. Because all of the Welfare Fund's claims accrued before July 15, 1984, the six-year statute of limitations ran before the complaint was filed on August 7, 1990.

In an effort to toll the statute of limitations, the Welfare Fund argues that Mr. Souder's letter of June 23, 1989, misled the Fund to its detriment by advising it that Rite Aid had acquired Muir as the result of an asset purchase rather than a stock purchase. According to the Fund, it was thereby misled about who to sue for the alleged deficiencies. As the district court noted in rejecting this argument, the Fund knew about the acquisition when it occurred in June 1984, but did not commence its audit until five years later. Furthermore, as the district court observed, there was "no evidence to support the Funds' assertion that Rite Aid's misrepresentation prevented them from identifying a legally responsible party or pool of assets to satisfy a judgment" because "at all relevant times, Muir was an existing corporation with sufficient assets to satisfy a judgment. This was a matter of public record." J.A. 27. At any time the Funds could have sued both Muir and Rite Aid, as eventually they did.

### B.

■ In that portion of its Memorandum and Order devoted to an exposition of the facts of this case, the district court made the following observation:

> Rite Aid had no statutory, regulatory or contractual obligation to maintain records

for any particular period other than the three year requirement contained in 29 C.F.R. § 516.5.

This statement by the district court is erroneous. It is clear that Muir and/or Rite Aid had a duty to maintain their employment records "for a period of not less than six years after the filing date of the documents ..." under 29 U.S.C. § 1027. *See United States v. S & Vee Cartage Co., Inc.*, 704 F.2d 914, 917 (6th Cir.), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983). However, for the reasons stated, we hold that defendants' failure to maintain the records for the six years required by the statute has nothing to do with the district court's conclusion that the statute of limitations in this case had run when the plaintiff filed its action.

### III.

Accordingly, the judgment of the district court is AFFIRMED.