**SHEET METAL WORKERS, LOCAL 19 and Sheet Metal Workers Welfare, Pension, Annuity, Industry, Apprentice and Vacation Funds of Local 19, Appellants in 90–1839,**

v.

**2300 GROUP, INC., t/a TM & M Storage Specialists, Appellant in 90–1878.**

Nos. 90–1839, 90–1878.

United States Court of Appeals, Third Circuit.

Argued June 27, 1991.

Decided Nov. 26, 1991.

Dennis P. Walsh (argued), Spear, Wilderman, Borish, Endy, Browning & Spear, Philadelphia, Pa., for appellants/cross-appellees Sheet Metal Workers Local 19 and Sheet Metal Workers Welfare, Pension, Annuity, Industry, Apprentice and Vacation Funds of Local 19.

George B. Ditter (argued), Jenkins, Tarquini & Jenkins, Ambler, Pa., for appellee/cross-appellant 2300 Group, Inc., t/a TM & M Storage Specialists.

Before BECKER, MANSMANN and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Plaintiffs Sheet Metal Workers Local 19 ("the Union") and the Sheet Metal Workers Welfare, Pension, Annuity, Industry, Apprentice and Vacation Funds of Local 19 ("the Funds") instituted this action against 2300 Group, Inc., doing business as TM & M Storage Specialists ("TM & M"). The plaintiffs claimed that they were entitled to employee benefit fund contributions owed to the Funds and "work assessment fees" (i.e., dues) owed to the Union for the employment of two union members, David Gurney and James C. Powell, for the period January, 1983 to March, 1985, pursuant to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, and section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.[1]

---

1. The district court had jurisdiction under §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132,

After a bench trial, the district court issued extensive findings of fact and conclusions of law. The court reaffirmed its earlier holding that the action was not barred by the statute of limitations. Moreover, it found that Powell had in fact performed no sheet metal work prior to April, 1983, and that no contributions were due for that period of time. Finally, the district court held that the plaintiffs were, as a matter of law, not entitled to contributions for all hours worked after Gurney and Powell began performing sheet metal work. *Sheet Metal Workers Local 19 v. 2300 Group, Inc.*, No. 89–2554, 1990 WL 157098 (E.D.Pa. Oct. 12, 1990) [hereinafter *"Sheet Metal III"*]. We will affirm the district court's judgment with respect to the statute of limitations and Powell's hours. However, we will reverse the court's determination that the plaintiffs are not entitled to contributions for sheet metal work performed by A1–B1 employees, and will remand for calculation of the amounts due.

## I.

TM & M is a small closely held company that was involved in several different types of businesses, including interior moving services for large offices and the sale and installation of closet fixtures, shelving, and lockers. The Union's jurisdiction under the collective bargaining agreement included installation of shelving and lockers. In January, 1982, Barbara Boldt (the president of TM & M), her husband Fred Boldt (TM & M's vice president), and Eugene Fiocchi formed a corporation known as A1–B1 Installers. They intended this corporation to perform sheet metal work, including installation of metal lockers and shelving, as a subcontractor for TM & M and other contractors. David Gurney and James Powell worked for both A1–B1 and TM & M, performing sheet metal work for A1–B1 and non-sheet metal work for TM & M.

## A.

The core of this litigation concerns the interpretation and application of separate labor agreements that the Union reached with TM & M and A1–B1, the "Employer Agreement" and the "Specialty Agreement." The latter incorporates by reference the terms of the Employer Agreement, and also includes similar terms. At issue is the extent to which the Employer Agreement's union dues and Fund contribution provisions apply to A1–B1 employees.

The similarities and differences between the Employer Agreement and the Specialty Agreement are crucial to an understanding of the legal issues raised. The Employer Agreement expressly covered "all of the Employer's employees engaged in but not limited to [all types of described sheet metal work] and (e) all other work included in the jurisdictional claims of Sheet Metal Workers' International Association." Employer Agreement [hereinafter "EA"] Art. I(1). The Specialty Agreement is narrower in this regard, covering "employees of the employer engaged in but not limited to the handling, assembly, erection and installation of ... Lockers and Shelving." Specialty Agreement [hereinafter "SA"] Art. I(1)(2).

The two agreements made identical provision for filing reports and payment to the Funds. Under the Employer Agreement, TM & M was required to file monthly reports and to make specific payments to the Funds on behalf of all covered employees. EA Art. XII (2). To ensure that TM & M contributed for all hours worked by a covered employee, the Employer Agreement required payments to be calculated on the basis of "hours of wages paid," which was defined as "the number of hours resulting from dividing gross wages by the employee's regular time hourly wage rate." EA

1145, § 301 of the LMRA, 29 U.S.C. § 185, and 28 U.S.C. § 1337. We have jurisdiction under 28 U.S.C. § 1291. The parties stipulated the following: the Employer is engaged in commerce pursuant to § 2(6) of the National Labor Relations Act (NLRA), 29 U.S.C. § 152(6); the Employer employed members of the Union in Pennsylvania pursuant to collective bargaining agreements; and the Employer is an employer within the meaning of §§ 2(2) and 301 of the LMRA, 29 U.S.C. §§ 152(2), 185, and §§ 3(5), 515 of ERISA, 29 U.S.C. §§ 1002(5), 1145.

Art. XII (1). The Specialty Agreement, in lieu of duplicating Article XII of the Employer Agreement, incorporated by reference the rules and regulations in the Employer Agreement concerning the payment of the various funds. SA Art. XIV.[2]

The monthly reports filed by TM & M under these agreements included a certification that the contributions covered under the report conformed with the applicable collective bargaining agreements and trust agreements.[3] This certification was filed with each TM & M "Benefit Funds Work Assessment." As we will discuss more fully, A1–B1 employees were paid through TM & M's payroll, so the certification also appeared on their payroll forms.

The Employer Agreement also stated that only journeymen sheet metal workers and registered apprentices should be employed on any work covered in the Agreement, EA Art. II(1), that TM & M "shall exert every possible effort to secure all work" covered in the Agreement, EA Art. II(2), and that the subcontracting or assigning of any work would comply with the Agreement's conditions of employment, "including, without limitations, those relating to ... benefits." EA Art. II(4); *see also* SA Arts. III(1), VIII(7)(8). The Specialty Agreement contained comparable provisions, but its language relating to subcontracting excluded the word "benefits." SA Art. II(1). Otherwise, the Specialty Agreement indicated that A1–B1 would comply with the subcontracting requirements of the Employer Agreement, SA Art.

XV, and would follow "agreements national in scope." SA Art. X(1).

Identical provisions in the two agreements required Union membership for employment. EA Art. III; SA Art. V. If a particular employee was not a union member at the beginning of employment, the employee had eight days to join. *Id.* In addition, both agreements provided that all employees would be hired through the Union. EA Art. IV; SA Art. IV.[4]

The Employer Agreement contained some unique provisions that are particularly relevant here. For example, the Employer Agreement, but not the Specialty Agreement, expressly contemplated the creation of new businesses or subcontracting arrangements. These provisions indicated that the terms and requirements of the Employer Agreement would be maintained even if another business were to be created. EA Art. II(10)(11). The Employer Agreement also recognized specialty agreements and enabled the Union's Business Manager "to take whatever steps were necessary" to add flexibility on the conditions to be followed "in recognition of the serious non-union competition." EA Article XVI.[5]

### B.

According to Barbara Boldt, when A1–B1 was formed as a union installer of sheet metal lockers and shelving, a Union official informed her that it was acceptable for A1–B1 to report its employees' salaries through TM & M. Thus, A1–B1 never had a separate payroll. Its employees were

---

**2.** Article XIV of the Specialty Agreement refers to the Employer Agreement as the "Building Trades Agreement." SA Art. XIV(1).

**3.** EMPLOYER CERTIFICATION: The undersigned employer acknowledges that the contributions covered by this remittance report are made in conformity with one or more written collective bargaining agreements and trust agreements currently in effect between the employer and the union representing the employees reported hereon, and that said employees listed above constitute all employees for whom contributions are required under the terms of the said agreement. The employer agrees to be bound in all respects by the collective bargaining agreement and the trust agreement creating

the funds for which these contributions are applicable and designates the employer trustees named therein and their successors as its representatives on the board of trustees and agrees to be bound by all actions taken by the said trustees, pursuant to the agreement and declaration of trust.

**4.** Because neither party raised the possibility that TM & M could have violated the two Agreements by hiring either Gurney or Powell outside the Union hiring hall, we do not address the issue here.

**5.** The Specialty Agreement in turn contained provisions not in the Employer Agreement but which are not applicable here.

paid from TM & M's account, and a single payroll record was kept for all the employees of both companies under TM & M's name.

Moreover, during the time period at issue, A1–B1 never submitted any reports or contributions to the Funds. Instead, TM & M reported the hours of all its employees, including those who worked for A1–B1, under TM & M's name. TM & M then paid the employees of A1–B1 out of its payroll account, billing A1–B1 for the wages and benefit fund contributions.

TM & M reported hours of wages and paid contributions into the Fund for three individuals, Eugene Fiocchi, David Gurney and James Powell. Only the contributions for Gurney and Powell are at issue in this case.

Gurney, who is Barbara Boldt's son, began work for TM & M in June, 1979 and later joined the Union. He performed sheet metal work during all of 1983 and 1984, and through the first three months of 1985. Powell, Gurney's friend, began to work for TM & M in the summer of 1982, installing closet fixtures. According to Barbara Boldt, Powell began to perform sheet metal work and to work for both TM & M and A1–B1 in April, 1983, and then joined the Union in May, 1983.

Gurney and Powell, then, began doing sheet metal work for A1–B1, but also continued to do non-sheet metal work such as closet fixture installation for TM & M. TM & M filed contribution reports on behalf of A1–B1 covering the amount of time spent by the employees on sheet metal work and billed A1–B1 for the amount of the contributions.

In June, 1984, Fiocchi left A1–B1 and formed a sheet metal installation company, Eastern Installers. Powell left A1–B1 for Eastern on July 19, 1984. Gurney followed suit on March 26, 1985. TM & M reported the hours of both Gurney and Powell to the Funds, as TM & M's employees, through their respective termination dates. Because it had no more employees covered by the collective bargaining agreement, TM & M submitted its last report to the Funds in April, 1985.

In early 1989, a Union agent reported to the Funds that TM & M was doing a sheet metal job at Rutgers University, but without union workers. Because TM & M had not informed the Funds that it had started using sheet metal employees again, and because it was still bound to an agreement with the Union, the Funds decided to audit TM & M. Barbara Boldt provided the auditor with the payroll register showing how much Gurney made in 1985, but would not provide all the records needed for the audit. As a result, the plaintiffs filed their complaint on April 7, 1989. They sought an accounting of sums due the Funds, injunctive relief requiring TM & M to remit reports and contributions in the future, and attorneys' fees, interest and costs, and statutory penalties under § 502 of ERISA.

After filing their complaint and during discovery, the plaintiffs conducted the audit that they had requested as part of their relief. While the plaintiffs narrowed their claim to allege delinquent contributions for Gurney and Powell during 1983, 1984, and the first quarter of 1985, *Sheet Metal Workers Local 19 v. 2300 Group, Inc.*, No. 89–2554, slip op. at 2, 1990 WL 10006 (Feb. 7, 1990) [hereinafter *"Sheet Metal I"*], there remained significant factual disputes about the extent of these delinquencies.

## II.

We review the district court's findings of fact under a "clearly erroneous" standard, and exercise plenary review over conclusions of law. We have plenary review of the district court's choice and interpretation of applicable tolling principles and its conclusion that the facts gave rise to a tolling of the statute of limitations. *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 45 (3d Cir.1990). We apply the clearly erroneous standard of review to the factual findings that underlie the district court's analysis of the tolling issue.

We have plenary review on whether the terms of the collective bargaining agreements are ambiguous. *International Union, United Mine Workers v. Racho Trucking Co.*, 897 F.2d 1248, 1252

(3d Cir.1990). Moreover, we review *de novo* the district court's construction of the collective bargaining agreements, which is a question of law. *See Teamsters Local 348 Health and Welfare Fund v. Kohn Beverage Co.,* 749 F.2d 315, 317–18 (6th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985).

### III.

#### A.

Both TM & M and the plaintiffs agree that the applicable statute of limitations is the three-year period provided in the Pennsylvania Wage Payment and Collection Law. 43 Pa.Stat.Ann. § 260.9a(g) (Purdon Supp.1990); *see Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45 (3d Cir.1990) (§ 260.-9a(g) is the most closely analogous state statute of limitations).[6] Since the last failure to report or contribute occurred in 1985, the three-year statute of limitations would have expired sometime in 1988. This action was filed on April 9, 1989. Thus, the action is barred unless the statute of limitations was tolled.

In its cross-appeal, TM & M challenges the district court's holding that the plaintiffs' claims were not barred by the statute of limitations. In *Vernau,* we noted that "state tolling principles are generally to be used by a federal court when it is applying a state limitations period." 896 F.2d at 45. Thus, in applying Pennsylvania law we must predict what the Pennsylvania Supreme Court would decide. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Tiernan v. Devoe,* 923 F.2d 1024, 1033 (3d Cir.1991). Under Pennsylvania law, an assertion of fraud or concealment for tolling the statute of limitations must be proved by "clear, precise and convincing" evidence. *Connors v. Beth Energy Mines, Inc.,* 920 F.2d 205, 211 (3d Cir. 1990).

The district court considered the tolling issue three times. The first occasion was in response to TM & M's motion for summary judgment. The court agreed with the plaintiffs that "the defendant's regular and express certification that all contributions were made to the Funds in conformity with the collective bargaining agreement operated as a fraud on the Funds, thereby tolling the statute of limitations." *Sheet Metal I,* slip op. at 3.

The second opportunity to address the tolling issue came in response to TM & M's motion for reconsideration of the motion for summary judgment. *Sheet Metal Workers Local 19 v. 2300 Group, Inc.,* No. 89–2554, 1990 WL 27369 (E.D.Pa. Mar. 14, 1990) [*"Sheet Metal II"*]. In denying the motion, the district court emphasized the significance of the certifications, as well as TM & M's concealment of underreporting hours. The court stated that "[t]he evidence is clear that until plaintiffs were informed in 1989 of a possible non-reporting as to employees subject to the collective bargaining agreement, plaintiffs had no reason to suspect any under-reporting of hours worked and contributions due between 1980 and 1985." *Id.* at 2–3. Therefore, with respect to tolling the statute of limitations, the court concluded that the plaintiffs "carried their burden of proving they exercised 'due diligence' and that the concealment by [TM & M] was such as to cause plaintiffs not to inquire." *Id.* at 3.

The district court also concluded that this result was unaffected by the plaintiffs' evident right to conduct an audit or inspect TM & M's records between 1980 and 1989. *Id.* The court noted that where an employer "has by affirmative act certified that its reports are correct and thereby caused plaintiffs to rely on the same, until and unless plaintiffs are in some way put on notice that the reports are incorrect, they should be able to rely on the certifications without fear that the statute of limitations may be running against a claim for underreporting." *Id.* Moreover, whether or not such concealment was intentional was not relevant because the Funds would have

---

6. We apply the Pennsylvania statute of limitations because there is no provision for a statute of limitations in the statutes under which this claim was brought, § 301 of the LMRA, 29 U.S.C. § 185, and § 515 of ERISA, 29 U.S.C. § 1132.

been "equally misled irrespective of the motive of the employer." *Id.* at 4.

In rejecting TM & M's attempt to raise the statute of limitations as a complete defense at trial, the district court acknowledged that the Funds had conducted audits in the past and knew that TM & M had committed reporting errors. While this evidence provided "a much closer question of 'due diligence' in discovering and filing the asserted claims by the Benefit Funds within the normal three-year period of limitations than was presented in the summary judgment motion," the district court nevertheless stood by its earlier reasons for concluding that the action was not barred by the statute of limitations. *Sheet Metal III* at 19–20.

### B.

▇ In deciding whether the statute of limitations was tolled in this case, we must first ascertain whether the district court invoked the proper tolling principle. Over the years the Pennsylvania state courts have developed a number of such theorems, including doctrines grounded in the existence or absence of inherent fraud, fraudulent concealment, or due diligence. An extensive discussion of these tolling issues appears in *Gee v. CBS, Inc.,* 471 F.Supp. 600, 622 (E.D.Pa.1979), *aff'd,* 612 F.2d 572 (3d Cir.1979), a case relied on by the district court.

▇ Pennsylvania's inherent fraud doctrine, as set forth in *Gee,* focuses on whether the underlying events are based upon fraud or deceit. If they are, "then that, without more, will toll the statute of limitations until such time as the fraud has been revealed or should have been revealed by the exercise of due diligence by plaintiffs." 471 F.Supp. at 622 (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946)). To prove inherent fraud, which is considered "self-concealing by its nature," a plaintiff must first

establish that the defendant made a representation in regard to a material fact. *Id.* (citing *Southern Development Co. v. Silva,* 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678 (1888)). Second, the plaintiff must demonstrate that the representation was false. *Id.* Third, the plaintiff must show that the representation was not actually believed by the defendant, on reasonable grounds, to be true. *Id.* Fourth, the plaintiff must have acted on the misrepresentation to his damage. *Id.* Finally, the plaintiff must show he was not only ignorant of the falsity of the representation, but also reasonably believed it to be true.[7] *Id.*

*Gee* also explained in some depth the alternative doctrine of "fraudulent concealment." Irrespective of any inherent fraud, the inquiry here is whether there was an affirmative and independent act of concealment that would divert or mislead a plaintiff about the underlying cause of action. *Id.* at 624.

In the present case the district court couched its tolling analyses in terms of inherent fraud *and* fraudulent concealment. We believe that the facts of this case are properly analyzed in terms of the narrower doctrine of inherent fraud. As the trial court noted in its ruling on the motion for summary judgment, the certification itself operated as a fraud: it affirmatively represented that certain data were true, while the reports submitted to the Funds omitted other data. It is true that some of TM & M's actions could be construed as affirmative concealment, but in our view the certificates themselves embodied the critical deception in this case and were thus self-concealing in nature. For this reason, TM & M's actions are best analyzed in terms of inherent fraud.

### C.

We next review the district court's decision that the plaintiffs demonstrated by clear, precise, and convincing evidence that

---

**7.** At one time the plaintiff was required to show that the defendant intended another party to act on the representation. The Pennsylvania courts have done away with this requirement, holding that inherent fraud can include unintentional and intentional deception, *id.* at 623 (citing *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 204 A.2d 473 (1964)), as well as any misrepresentation of a material fact. *Id.* (citing *Guy v. Stoecklein Baking Co.,* 133 Pa.Super. 38, 1 A.2d 839 (1938)).

all the elements of inherent fraud were met. In ruling on the motion for summary judgment, the district court addressed whether TM & M had misrepresented a material fact. There it noted the plaintiffs' uncontradicted allegations that at all times relevant to this case, TM & M submitted benefit fund reports containing the numbers of hours of contributions made to the Fund, that such reports included a certification that the contributions conformed with the Employer Agreement, and that these reports failed to include some hours worked for two union members. The court also noted TM & M's admitted failure to include hours worked for two union members. These factual findings, which were adopted by the district court after trial, were not clearly erroneous. We agree that these facts also constituted misrepresentation of material fact.

The district court also ruled that the plaintiffs' reliance on the certifications proved to be detrimental because they did not bring their action within the statute of limitations. *Sheet Metal I,* slip op. at 8–9. At trial the defendant offered no evidence to contradict this finding. Moreover, there is no dispute that the plaintiffs did not know the certificates were false and that it was reasonable to believe they were true. Therefore, we agree that in acting on the misrepresentations, the plaintiffs were ignorant of their falsity, reasonably believed them to be true, and suffered damage.

The district court also stated that TM & M's initial refusal to allow the Union to audit its records "raise[d], at least, a permissible inference that [TM & M] did not actually believe on reasonable grounds that its certifications were true." *Id.* at 9. After trial the district court adopted this fac-

tual inference; we believe the inference was not clearly erroneous. In light of the factual findings outlined above, we agree with the district court that TM & M's communications to the Funds constituted an inherent fraud, and that the statute of limitations was tolled.

### D.

Our next task is to determine whether, under the facts found by the district court, the plaintiffs were entitled to the continued benefits of tolling. Regardless of the fraud leading a plaintiff to "relax vigilance or deviate from the right of inquiry" in the first instance, *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 556 (3d Cir. 1985), it is possible for a plaintiff's later behavior to cause the statute of limitations to run again. As we noted in *Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268 (3d Cir.1987), "the mere fact that [there is] fraud does not mean that the statute is always gone. It only means that [it is] tolled until the effects of the fraud have been nullified by knowledge by the plaintiff." *Id.* at 1273 (quoting lower court). In other words, to continue to benefit from tolling, a plaintiff must exercise reasonable diligence. *See Urland,* 822 F.2d at 1273–74.[8]

Under Pennsylvania law, a statute of limitations is tolled until "plaintiffs knew or using reasonable diligence should have known of the claim," regardless of whether the statute is tolled because of the discovery rule or fraudulent concealment. *Vernau,* 896 F.2d at 46 (quoting *Urland,* 822 F.2d at 1272). The Pennsylvania courts recognize that "[t]here are very few

---

**8.** Our earlier finding that TM & M's certification and reports were inherently fraudulent does not prevent us from analyzing the plaintiffs' diligence. A comment by Judge Weis in *Byrnes v. DeBolt Transfer, Inc.,* 741 F.2d 620 (3d Cir.1984), characterizes the concerns and circumstances of this case. In this case as well as in *Byrnes,*

the defendants' reporting obligation is based on contract. The characterization of that duty as 'self-reporting' is not a talismanic phrase that imbues the obligation with fiduciary status. Also of importance is that the same contract gives plaintiffs the right to con-

duct periodic audits. Therefore, the inquiry into the plaintiffs' diligence has more significance than where a party does not have access to information available to plaintiffs here.

741 F.2d at 627 (Weis, J., concurring). In the present case, the plaintiffs had access (through audits permitted by the labor agreements) to the information they now claim is false and incorrect. An inquiry into reasonable diligence is therefore appropriate. With all that said, however, we agree with the district court's conclusion that the plaintiffs exercised reasonable diligence under the circumstances.

facts which diligence cannot discover." *Id.* A plaintiff, however, cannot be expected to exercise diligence unless there is "some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Id.* (quoting *Urland,* 822 F.2d at 1273). "[P]laintiffs need not know that they have a cause of action or that the injury was caused by another party's wrongful conduct," *id.* (quoting *Urland,* 822 F.2d at 1275), "for once [a plaintiff] possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." *Id.* (citations omitted).

■ In arguing that the plaintiffs were not reasonably diligent, TM & M relies mainly upon the Pennsylvania "discovery rule." This judicially created rule postpones the running of the statute of limitations so long as a party is unable to know of injury despite the exercise of due diligence. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 85, 468 A.2d 468, 471 (1983). In TM & M's view, because the plaintiffs possessed the right to audit records, they possessed the ability to detect the irregularities alleged in this case long before the statute of limitations expired. Under this argument, the plaintiffs' failure to exercise their right to audit demonstrates a lack of reasonable diligence.

We agree with the district court that the plaintiffs' failure to audit did not cause the statute of limitations to run again. As the district court found in rejecting TM & M's audit argument,

> The collective bargaining agreements contemplated a self-reporting system and certification for the obvious purpose of vitiating the need for constant and disruptive audits of the employer's records by plaintiffs.

*Sheet Metal I,* slip op. at 10. The Employer Agreement specifically outlined an accounting system that required TM & M to supply accurate monthly reports of wage and hour information. Thus, the very terms of the Agreement embody the plaintiffs' placement of trust and confidence in TM & M to submit accurate reports. *See Bugher v. Consolidated X–Ray Serv. Corp.,* 515 F.Supp. 1180 (N.D.Tex.1981) *aff'd,* 705 F.2d 1426 (5th Cir.1983), *cert. denied,* 473 U.S. 904, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985). Under the agreement in this case, audits were not meant to serve as the Funds' standard method of accounting.

This is not to say, however, that it is reasonable in all circumstances for a recipient of information under a self-reporting regime to rely solely on the representations contained in regular reports. Rather, such a party must remain vigilant with regard to other possible reasons to know of a defendant's breach. In the present case, for example, the Funds initiated this suit after learning that TM & M had not reported hours and wages for a job at Rutgers University. Moreover, because the plaintiffs conduct audits on a regular, but not constant, basis, they do not rely entirely upon the representations of the Funds.

Our conclusion that the Funds had no "reason to awaken inquiry," and that they were therefore reasonably diligent, is supported by our decision in *Vernau.* There the defendant-employer's three-year collective bargaining agreement provided that the defendant would make payments to benefits trust funds on behalf of all of its employees, other than "baggers" who could not constitute more than ten percent of the defendant's work force. Seven years after entry into the agreement, the plaintiff-funds claimed that the defendant owed past-due benefits payments because the defendant had exceeded the ten percent limit on baggers. The defendant's monthly reports submitted to the plaintiff "clearly showed" that the limit had been exceeded, "often substantially," in all but two of the 31 months at issue, and an audit discovered monthly under-reporting of baggers. 896 F.2d at 44.

In holding that the funds' suit was barred under Pennsylvania's three-year statute of limitations, we noted that a reasonably diligent agent for the funds would have known "instantly" that the defendant

had exceeded the ten percent ceiling through a simple calculation—moving the decimal point in the total employment number and comparing that number to the number of baggers reported. We rejected the funds' contention that their agents had not performed the calculation because the funds had not informed the agents about the ten percent ceiling; reasonable diligence required further action. *Id.* at 46. Moreover, we noted that the funds' agents spent time reviewing the reports, often revising the reported figures in order to make corrections.

In the present case, there was no indication on the face of TM & M's monthly reports to the Union that the terms of the agreement had not been followed and that TM & M was underreporting hours. Both Gurney and Powell were reported to the Union as employees of TM & M, not as employees of A1–B1. They were then paid as TM & M employees with TM & M checks. There was nothing in the monthly reports to distinguish their wages from those of other employees. Reports of irregular or few hours are common, particularly because the Funds frequently deal with small contractors. TM & M has pointed to no aspect of the reports that should have alerted the plaintiffs to irregularities. *Compare Connors v. Beth Energy Mines, Inc.*, 920 F.2d 205, 212 (3d Cir.1990) (no tolling where data supplied to fund reflected change in accounting method at the center of dispute); *see also Vadino v. A. Valey Eng's*, 903 F.2d 253, 261 (3d Cir. 1990) (statute of limitations tolled until it was or should have been clear to employee that union would not pursue his grievance). For these reasons, we conclude that the Funds were reasonably diligent. As a result, the statute of limitations was tolled, and this action is not barred.

### IV.

### A.

We next review the district court's conclusion that the plaintiffs had failed to prove by a preponderance of the evidence that TM & M or A1–B1 underreported hours of wages paid to Gurney and Powell during 1983, 1984, and 1985, and underpaid the Funds. According to the district court, if an employer hires a sheet metal worker through the Union hiring hall, that employer should contribute to the funds "on the basis of all hours worked by the employee whether or not the employee is utilized and assigned to sheet metal work." *Sheet Metal III*, slip op. at 15. Yet the court went on to conclude that Gurney and Powell were only covered for the time they engaged in sheet metal work, having made the following factual findings: (1) A1–B1 was only a "mom and pop" business and not the typical employer with which the Union normally dealt; (2) A1–B1 served only as a subcontractor to TM & M; and (3) A1–B1 did not hire Gurney or Powell through the hiring hall or intend to use them to perform sheet metal work "within the scope of work set forth in the bargaining agreements." *Id.* at 16. The district court concluded that had TM & M and A1–B1 kept entirely separate records, made separate payroll checks, established formal written subcontracts for the sheet metal work, and independently and formally hired Gurney and Powell part-time or for different work hours, the Funds would not be entitled to payments based on the total number of work hours performed for both TM & M and A1–B1.

According to the plaintiffs, however, the district court's construction of the Employer Agreement was incorrect given its plain meaning, intent, and usage. They contend that the Employer Agreement expressly covers "the rates of pay, and conditions of employment of all employees of the employer engaged in but not limited to" sheet metal work, as defined by the jurisdictional clause of agreement. EA Art. I(1). Thus, they claim that the contract does not cover Union employees only when they perform sheet metal work; rather, it covers all their work activities. Moreover, they contend that the district court's "hiring hall" distinction and emphasis on the familial and friendship relationships in A1–B1 have no merit because the employee status of Gurney and Powell is governed only by Article I(1) of the Employer Agreement. The plaintiffs contend that they have consist-

ently construed the Employer Agreement to require employers to contribute to the Funds on the basis of all hours worked by employees. "In other words, once an employee performs sheet metal work as defined by Article I of the agreement, that employee is covered by the agreement for all purposes." Brief for Appellants/Cross Appellees at 9–10.

The plaintiffs provide other reasons for this construction, including the need to prevent employers from limiting their contributions to the minimum required for benefits coverage, the impossibility of policing whether the employee is engaged in the covered work, and the impracticality of resolving jurisdictional disputes concerning whether work is covered by the contract every time an employer submits reports to the Funds.

TM & M responds, as it did at trial, that since April, 1983, all sheet metal work was subcontracted by TM & M to A1–B1, and that Gurney and Powell were A1–B1 employees when they did sheet metal work. TM & M asserts that it properly reported and paid to the Fund on behalf of A1–B1 all amounts to which the Fund was entitled for sheet metal work only.

 Federal law governs the interpretation of a collective bargaining agreement. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957); *Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning*, 934 F.2d 35, 40 (3d Cir.1991); *Abbate v. Browning–Ferris Indus. of Elizabeth N.J., Inc.*, 767 F.2d 52, 55–56 (3d Cir.1985). "Although a collective bargaining agreement differs from an ordinary contract, the meaning of a collective bargaining agreement may be determined by applying general rules of [state] contract law as long as federal labor law does not provide a conflicting rule." *Keystone Heating*, 934 F.2d at 40.

 It is the role of the court to interpret a written contract when "the terms and surrounding circumstances are unambiguous." *Id.* at 41; *Griesmann v. Chemical Leaman Tank Lines, Inc.*, 776 F.2d 66, 72 & n. 9 (3d Cir.1985). However,

in deciding whether a contract is clear or ambiguous, we do not simply determine whether, from our point of view, its words are ambiguous. Rather, we "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980). In these circumstances, a judge may "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Id.*

### B.

We agree with the district court that the "terms and surrounding circumstances" of both the Employer Agreement and the Specialty Agreement in this case are unambiguous, but believe that the the district court's construction of the agreements was incorrect. Examination of the Employer Agreement and the Specialty Agreement reveals that all sheet metal employees are covered under the Employer Agreement irrespective of whether they perform non-sheet metal work, or whether they are part of a "mom and pop" specialty or subcontracting enterprise like A1–B1. Article I(1) of the Employer Agreement clearly states that the Agreement covers "all employees of the employer engaged in but not limited to [all types of described sheet metal work] and (e) all other work included in the jurisdictional claims of Sheet Metal Workers' International Association."

The Union's "jurisdictional claims" are far reaching and expressly incorporate the circumstances of a specialty or subcontracting agreement. Article XIV of the Specialty Agreement incorporates by reference all rules and regulations in the Employer Agreement concerning the payments to the various funds. Therefore, if the Employer Agreement covers all of an employee's hours for contributions to the Funds, regardless of the type of work per-

formed, it covers employees of both TM & M and A1–B1 such as Gurney and Powell.

Moreover, Article II(4) of the Employer Agreement confirms that TM & M shall not subcontract any of the work covered in the Agreement to any contractor or sub-contractor who does not agree in writing to comply with the conditions of employment, including those relating to union benefits and working conditions. Likewise, Article XV of the Specialty Agreement contains a provision specifying A1–B1's compliance with the Employer Agreement's subcontracting requirements. Finally, Article X of the Specialty Agreement requires that A1–B1 follow any "agreements national in scope" between the Union and other international unions.

These provisions make clear that the Employer Agreement and other agreements cover any subcontracting or specialty agreement between TM & M and A1–B1. Furthermore, the Employer Agreement also contains provisions on the creation of new businesses or subcontracting arrangements that directly apply here. Under Article II(10), for example, TM & M "agrees that no evasion of the terms, requirements and provisions of this Agreement will take place by the setting up of another business to do work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility thereunder." Thus, A1–B1's contention that its "mom and pop" status permits evasion of the terms of the Employer Agreement has no merit.

Furthermore, Article II(10) also covers circumstances where TM & M's officers or directors control another entity. "If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity ... wherein the Employer through its officers, directors ... exercises either directly or indirectly control of labor policies of such other entity, the terms and conditions of this Agreement shall be applicable to all such work." This discounts A1–B1's contention that its informal makeup and close association with TM & M was a "special" circumstance.

Also applicable is Article XVI of the Employer Agreement, which allows Union officials to counteract incidents of "serious non-union competition and infringement" upon the Union's boundaries. Under this provision, the president and business manager of the Union are "empowered to take whatever steps are necessary, including additional flexible conditions on particular jobs sometimes known as 'pin-pointing,' to enter into specialty agreements and [addenda] to this Agreement to ensure that such work will be captured for our membership."

██ We believe that the district court erred. Whether or not an employee was hired through the hall, family ties, or a personal friendship should not warrant a different application of the unambiguous terms of the Employer Agreement. Once an individual performs sheet metal work, that person is covered by the Employer Agreement even if that person subsequently performs other types of work for TM & M. Thus, all hours of wages paid must be reported to the Funds for contributions.[9]

## V.

At trial, the plaintiffs also contended that all of the hours for which Powell was

**9.** Because the Specialty Agreement incorporates by reference the terms of the Employer Agreement, A1–B1 is bound to the Employer Agreement as though it were an original signatory. Because we have decided that all of an employee's hours are included in the Agreement (Art. I(1)), A1–B1 is bound to this interpretation. Therefore, we need not decide whether TM & M and A1–B1 are "alter egos" that would be equally liable for obligations under a contract signed by only one. See National Labor Relations Bd. v. Al Bryant, Inc., 711 F.2d 543, 553 (3d Cir. 1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); see also National Labor Relations Bd. v. Rockwood Energy & Mineral Corp., 942 F.2d 169 (3d Cir.1991); National Labor Relations Bd. v. Omnitest Inspection Servs., Inc., 937 F.2d 112, 118 (3d Cir.1991) (alter ego relationship "is established when there is a 'mere technical change in the structure or identity of the [old] employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management'") (citation omitted).

paid in 1983 should have been included in calculating the contributions that were due the Funds. TM & M responded that until April, 1983, Powell did no sheet metal work, was not a member of the Union, and was not yet qualified to do such work. The district court sided with TM & M.

The plaintiffs now contend that the district court erred in crediting Barbara Boldt's trial testimony that Powell became a member of the Union in April, 1983, and that he had performed no sheet metal work before that time. They claim that the district court should have instead relied on her deposition testimony that in 1983 all of TM & M's ten employees, including Gurney and Powell, performed all of TM & M's jobs, including the installation of sheet metal shelving and lockers. According to TM & M, however, a proper reading of this deposition testimony in context indicates that her statement about the duties of her employees referred to other employees, not to Powell in particular. The plaintiffs offered no other evidence to buttress their argument. We agree with TM & M that the plaintiffs provide a strained reading of Barbara Boldt's testimony. The district court's determination in this regard was not clearly erroneous.[10]

### VI.

We will affirm the district court's judgment with respect to the statute of limitations and Powell's hours, but we will reverse the court's conclusion that the plaintiffs are not entitled to contributions. We will remand for proceedings consistent with this opinion.

10. The plaintiffs also contend that the district court erred in holding that the requirement of contribution to the Funds on an employee's behalf was dependent on that employee's union membership. However, TM & M correctly notes that the district court made no such conclusion. The district court stated only that no contributions were due for wages paid to Gurney and Powell when they they did non-sheet metal work for TM & M prior to joining the Union, a conclusion of law with which we agree. The district court's statement about union membership only referred to the date that Powell entered the Union in order to corroborate the testimony that Powell had not performed any sheet metal work before April, 1983.