**BOARD OF TRUSTEES, Sheet Metal Workers' National Pension Fund, et al., Plaintiffs,**

**v.**

**D'ELIA ERECTORS, INC., Defendant.**

No. Civ.A. 97–1461–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 31, 1998.

**512**

Seth B. Popkin, Office of General Counsel, Sheet Metal Workers' National Pension Fund, Alexandria, VA, for Plaintiffs.

Stewart C. Economou, J. Casey Forrester, Economou, Forrester & Ray, Alexandria, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this ERISA[1] action, the defendant-employer does not dispute that since 1981 it has unlawfully failed to pay contributions due to the plaintiff-funds. The sole dispute presented on defendant's motion for partial summary judgment is the extent of this liability. Defendant asserts that plaintiffs, who filed this action in September 1997, are barred by the applicable five-year statute of limitations from collecting any damages caused prior to September 1992. Plaintiffs counter that this action did not accrue, and therefore the statute of limitations did not begin to run, until the middle of 1997, when they first learned, and, by their lights, first should have learned, of defendant's unlawful conduct. Because plaintiffs are correct in this regard, there is no time bar, and thus plaintiffs are entitled to collect damages incurred as a result of the

delinquent contributions from 1981 until the present.

## I

The facts of this case are essentially undisputed. Defendant D'Elia Erectors, Inc. ("D'Elia"), a New Jersey corporation, is engaged in the sheet metal business; it erects and installs commercial signs. Since May 1, 1981, D'Elia has been a party to certain collective bargaining agreements ("CBAs") with the Sheet Metal Workers' International Association, the labor organization that represents D'Elia's employees. The CBAs between D'Elia and the union remained in effect at least until March 31, 1998. Pursuant to the CBAs, D'Elia was required to make contributions and submit monthly reports to plaintiffs, the Board of Trustees of the Sheet Metal ·Workers' National Pension Fund and the Board of Trustees of the National Training Fund for the Sheet Metal and Air Conditioning Industry (collectively referred to as the "Funds").

The instruments and documents governing the Funds allow the Pension Fund to accept for participation employees who are not represented by the local union for purposes of collective bargaining; that is, non-bargaining-unit employees can still participate in the Pension Fund if the employer so elects. On May 18, 1982, D'Elia exercised this option and submitted a Request for Participation as a Special Class of a Contributing Employer, in which it listed Jay D'Elia, D'Elia's president and sole employee at the time, as a non-bargaining-unit employee. The Pension Fund granted D'Elia's Request, and the parties then entered into a Participation Agreement.[2] According to the terms of the Participation Agreement, D'Elia was required to make payments to the Pension Fund for all of its non-bargaining-unit employees at the same rate it paid contributions for its bargaining-unit employees. The Participation Agreement further obliged D'Elia to prepare monthly Remittance Reports in which it would report each employee's hours worked and wages earned, as well as the amount of

---

**1.** The Employee Retirement Income Security Act is codified at 29 U.S.C. §§ 1001–1461.

**2.** Although the agreement is dated August 1982, it was in fact made effective, retroactively, as of May 1981.

contributions due to each of the Funds for each employee. D'Elia admits in its answer that it is the primary source for the information provided in the Remittance Reports and that the Funds rely on D'Elia's honesty and accuracy in completing these reports.

From approximately May 1, 1981, until April 1997, pursuant to the Participation Agreement, D'Elia submitted to the Pension Fund contribution payments for Jay D'Elia's work as a non-bargaining-unit employee. During that same period, however, D'Elia failed to provide the requisite information and to submit the Remittance Reports to both Funds for numerous other bargaining- and non-bargaining-unit employees. In particular, D'Elia never listed one of its employees, Debra D'Elia, on its Remittance Reports, nor did it pay contributions for her, even though she had been a non-bargaining-unit employee covered by the Participation Agreement since 1983. Debra D'Elia did, however, sign the monthly Remittance Reports, and from January 1986 forward, she signed these reports for the company as "Secretary" or "Secretary/Treasurer." Finally, D'Elia failed to report any of the required data and to make all contributions for any of its employees for the months of April 1997 through July 1997.

As a result of the complete absence of payments and reports for these four months, in March 1998, and again in June 1998, the Funds engaged an accounting firm to conduct audits to determine whether D'Elia had submitted accurate Remittance Reports and contributions in the past. Both audits revealed that D'Elia had failed to report to the Funds the names of some of its employees, both bargaining-unit and non-bargaining-unit, and that it had failed to pay the contributions due with respect to these employees since May 1, 1981. This was the first time the Funds became aware of any deficiencies in D'Elia's reporting.

The Funds filed this action on September 15, 1997, alleging that D'Elia's repeated failure to report all of its bargaining- and non-bargaining-unit employees and to pay the requisite contributions constituted various violations of ERISA, the Participation Agreement, and the CBAs.[3] On December 18, 1997, a default was entered against D'Elia. After the Funds filed a motion for default judgment, D'Elia filed a motion to set aside the default. This motion was granted, and D'Elia was given leave to file its answer and grounds of defense. In its answer, D'Elia admits liability, but asserts a partial defense based on the statute of limitations. Thus, D'Elia claims that the Funds should be foreclosed from recovering any damages caused by its admitted violations of ERISA, the Participation Agreement, and the CBAs that were incurred prior to September 15, 1992, that is, that were incurred more than five years before the institution of this action.

## II

■ The analysis properly begins with a determination of the governing statute of limitations. ERISA does not contain a limitations provision for most causes of action brought under the Act.[4] Thus, in choosing the applicable limitations period for ERISA claims, federal courts look to the most analogous state statute of limitations. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975) (stating rule that when "there is no specifically stated or otherwise relevant federal statute of limitations for a cause of action ... the controlling period would ordinarily be the most appropriate one provided by state law"); *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir.1992) (borrowing state statute of limitations in ERISA case).[5] In

---

3. The parties have stipulated that damages for the period from May 1, 1981, through May 31, 1998, total approximately $189,000. This amount includes damages for delinquent contributions, accrued interest on those contributions, liquidated damages, attorney's fees, and costs.

4. ERISA does provide a limitations period for actions alleging breach of fiduciary duty. *See* 29 U.S.C. § 1113. No such breach is alleged here, however. Furthermore, 28 U.S.C. § 1658 pro-

vides a four-year statute of limitations for all federal causes of action that are based on statutes enacted after December 1, 1990. Because ERISA was enacted in 1975, § 1658 does not apply here.

5. *See* also *Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) ("The implied absorption of State statutes of limitation within the interstices of the federal enactments is a phase of fashioning remedial details

Virginia, the most analogous provision is Va. Code § 8.01–246(2), which provides for a five-year limitations period for actions for breach of written contracts. *See Shofer,* 970 F.2d at 1319 (ERISA action applying limitations period for both negligence and breach of contract); *Central States S.E. & S.W. Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1105 (6th Cir.1986) (collecting ERISA cases applying limitations period for breach of written contracts). Accordingly, this action is governed by the five-year period established by § 8.01–246(2).

■■■ Although the governing limitations period is borrowed from state law, the time at which the cause of action accrues is determined by federal law. *See Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir.1983); *accord Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.,* 906 F.2d 1371, 1372 (9th Cir.1990). The federal "discovery rule" provides that a cause of action accrues, and the statute of limitations thus begins to run, only when the plaintiff knows, or through the exercise of reasonable diligence should know, of the injury it has suffered. *See Blanck,* 707 F.2d at 819 (citing *Holmberg,* 327 U.S. at 396–97).[6]

where Congress has not spoken but left matters for judicial determination within the general framework of familiar legal principles.").

6. *See also Nasim v. Warden, Maryland House of Correction,* 64 F.3d 951, 955 (4th Cir.1995) ("[I]t is now well established that a federal cause of action accrues upon inquiry notice."); *Connors v.. Hallmark & Son Coal Co.,* 935 F.2d 336, 343 (D.C.Cir.1991) (holding that in ERISA case "the Trustees' claims accrued only at the time when, in the exercise of due diligence, the Trustees would become aware of [the defendant's] alleged inaccuracies"); *Northern California Retail Clerks Unions,* 906 F.2d at 1372 ("Under federal law that time [when an ERISA cause of action accrues] is when the plaintiff knows or has reason to know of the injury that is the basis of the action."); *Hamilton v. 1st Source Bank,* 895 F.2d 159, 163 (4th Cir.1990) (applying discovery rule in ADEA case).

7. D'Elia advances a second, unpersuasive argument support its theory that the Funds should have known that Debra D'Elia was an unlisted, covered employee. D'Elia asserts, correctly, that the Request for Participation was filed to obtain

## III

The central question presented on summary judgment is when this cause of action accrued. More specifically the question is whether, through the exercise of reasonable diligence, the Funds should have known before May 1997, when they discovered that the April 1997 reports had not been filed, that D'Elia had not been making payments or filing reports for several of its employees, including Debra D'Elia, since 1981. If the Funds' ignorance of the breaches was not attributable to a lack of reasonable diligence on their part, this cause of action would not have accrued until May 1997, in which case the Funds could recover damages for the entire 1981 to 1997 period. On the other hand, if the Funds, through the exercise of reasonable diligence, should have discovered the breaches any time prior to 1992, then the damage period would be limited to five years prior to the filing of the complaint.

D'Elia contends that, because Debra D'Elia's signature appeared at the bottom of the Remittance Reports, but her name did not appear on the list of either bargaining-unit or non-bargaining-unit employees for whom the contributions were being paid, the Funds were on inquiry notice as early as 1982 that the Remittance Reports were inaccurate.[7] The issue is thus now more refined:

coverage for non-bargaining-unit employees. D'Elia further asserts that because the Funds were thus on notice that D'Elia had at least one non-bargaining-unit employee for whom it was required to make contributions, and because, in the early 1980s, the only employee listed on the Remittance Reports (Jay D'Elia) was, by D'Elia's lights, a bargaining-unit employee, the Funds should have known that those reports were inaccurate, as they did not list a non-bargaining-unit employee. This argument erroneously assumes that Jay D'Elia was a bargaining-unit employee. The Request for Participation form itself, however, indicates that Jay D'Elia was in fact a *non*-bargaining-unit employee. Accordingly, the fact that he was listed as the only employee on the Remittance Reports should not have raised any concern with the Funds—as far as they were concerned, Jay D'Elia was the non-bargaining-unit employee for whom D'Elia submitted the Request for Participation, and who in fact was listed on that form as a non-bargaining-unit employee. Indeed, if Jay D'Elia had been a bargaining-unit employee and the only employee of D'Elia Erectors in 1982, there would have been no need at that time for D'Elia to file a Request

What investigation, if any, did reasonable diligence require the Funds to undertake in light of Debra D'Elia's signature at the bottom of the Remittance Reports?

▮ Reasonable diligence is not easily defined; it depends on the facts of each case. Put simply (though perhaps tautologically), it is that level of inquiry that reasonably may be expected in a given set of circumstances. The Fourth Circuit has defined *due diligence* thus:

> Such a measure of prudence, activity or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.

*Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 941 (4th Cir.1991) (internal quotation marks omitted). This definition, unfortunately, sheds little light on what diligence might require in any given case, and specifically given the facts presented here. Of course, the definition does not purport to achieve that goal, as it recognizes that the analysis must proceed on a case-by-case basis. Because there is no controlling or even persuasive authority on the question in this circuit, resort must be had to decisions from other circuits discussing the requirements of reasonable diligence in similar circumstances. In this regard, two decisions, although factually distinguishable, are particularly instructive, as they reflect the principles that are dispositive here. Although in both cases the cause of action was deemed to have accrued immediately upon the occurrence of the violation, given that the funds involved there should have known of the violation when it occurred, the principles set forth in those decisions point persuasively to the conclusion that the instant action should not be deemed to have accrued until the Funds actually learned of the delinquent contributions.

The first case, *Michigan United Food & Commercial Workers Unions v. Muir Co.*, 992 F.2d 594 (6th Cir.1993), involved two related funds, a welfare fund and a pension fund. The welfare fund sued one of its contributing employers for failure to provide accurate information and failure to pay due and owing contributions. The district court ruled that under the discovery rule, the claim accrued in July 1984, and that therefore, pursuant to the applicable six-year limitations period, the action, which was filed in August 1990, was time-barred. On appeal, the welfare fund argued that reasonable diligence did not require it to learn of the employer's violations until April 1990, and therefore that its claim was not stale. *See* 992 F.2d at 598. Fatal to the welfare fund's claim, however, was the fact that at all relevant times, the pension fund had in its computer database all the data that the welfare fund needed to detect the inaccurate reporting and calculate the amount of contributions due, including the names of employees and the number of hours they worked. *See* 992 F.2d at 599. And, although the welfare fund and the pension fund employed separate staff, they shared a common manager and were located in the same building. Moreover, the two funds shared the same computer database, and thus when the funds received their respective monthly reports from employers, they entered the relevant data into the same computer system. *See* 992 F.2d at 595–96. Thus, the Sixth Circuit held that the welfare fund did not act with reasonable diligence because, based on "information *already within [its] possession,* [the fund] had the ability to discover probable discrepancies and underpayments at any time after the employer's monthly reports were received." *See* 992 F.2d at 599 (emphasis added); *see also* 992 F.2d at 596 ("Because all the pension and welfare fund data was contained in the same database, although possibly in separate computer files within it, the data from the employer reports concerning an employee's status at Muir could be easily cross-checked."). Moreover, the Sixth Circuit noted, both funds had conducted audits in the past that had revealed the employer's "routine billing and paying errors." These audits, the Sixth Circuit found, put the funds

---

for Participation for coverage of non-bargaining-unit employees. Thus, D'Elia's argument on this

score fails.

on notice that such errors were "likely to occur" in the future, *see* 992 F.2d at 596, 599; and knowledge that such errors were likely to occur imposed upon the funds a duty "to inquire into the possibility of errors in the employer monthly reports." 992 F.2d at 600. And, had the funds so inquired, or had they acted with reasonable diligence in reviewing their records, they would have learned of the errors in issue sooner. The Sixth Circuit thus held that the cause of action accrued, and the statute of limitations began to run, when the funds first received the employer's deficient monthly reports, and not when they first learned of the deficiencies. *See id.* at 600.[8]

The Third Circuit reached a similar result in *Vernau v. Vic's Market, Inc.*, 896 F.2d 43 (3rd Cir.1990). The CBA in effect in that case provided that no more than ten percent of the defendant-market's workforce could be made up of "baggers." The trustees of various funds that covered defendant's employees sued the employer for violation of the CBA's ten-percent provision. As in *Michigan United*, the employer in *Vernau* contended that the asserted claims were stale because the funds should have discovered the violations sooner. The Third Circuit agreed, finding that the reports the defendant had submitted to the funds "clearly showed that the ten-percent ceiling was exceeded, often substantially, in 29 of the 31 months at issue." 896 F.2d at 44. Furthermore, the court observed that the funds could have discovered these violations through a "simple calculation with figures supplied by [the employer]." 896 F.2d at 47; *see also id.* at 46 ("[T]he Trustees needed only to move the decimal point in the total employment number and compare the resulting number to the number of baggers reported."). The Third Circuit thus found that it was evident on the face of the reports submitted to the funds that the employer was not abiding by the terms of the CBA. Based on this finding, the *Vernau* court concluded that the funds' failure to discover the consistent violations of the CBA resulted from a lack of reasonable diligence. Accordingly, the court declined to delay the commencement of the applicable limitations period, and held that the cause of action accrued when the injury was caused, not when it was discovered. *See* 896 F.2d at 47.

█ In deciding when the instant cause of action accrued, the pertinent question is, as it was in *Michigan United* and *Vernau*, "whether the Funds had sufficient notice of probable discrepancies in the employer's contribution reports that the concept of due diligence required them to investigate long before they did." *Michigan United*, 992 F.2d at 599; *see also Vernau*, 896 F.2d at 46 (asking whether there was "some reason to awaken inquiry and direct diligence in the channel in which it would be successful" (internal quotation marks omitted)). This question must be answered in the negative given the facts of this case. The Funds here, unlike the funds in *Michigan United* and *Vernau*, did not have in their possession adequate information to discover that D'Elia was not submitting accurate reports. They had no information in their computer system or elsewhere that indicated that certain names were missing from the list of covered employees; they never conducted audits, prior to March 1998, that alerted them to D'Elia's deficient reporting practices, nor were they otherwise aware of any inaccuracies in past reports; and nothing on the face of the Remittance Reports submitted suggested that D'Elia might have been in violation of the CBAs, the Participation Agreement, and ERISA. In short, there is no reason to expect that the Funds, through the

---

8. In discussing when the statute of limitations began to run, the *Michigan United* decision uses the terms "accrual" and "tolling" interchangeably. *See, e.g.,* 992 F.2d at 597, 600. The doctrines of accrual of a cause of action, on the one hand, and tolling a statute of limitations, on the other, however, are distinct, though easily confused: Accrual marks the time at which the statute of limitations begins to run in the first instance. *See Black's Law Dictionary* 21 (6th ed.1990). Tolling, by contrast, halts the statute once it has already begun to run. *See id.* at 1488. It appears that other courts have also conflated the two concepts. *See, e.g., Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir.1988) (holding that the discovery rule was "not available to toll the statute of limitations"); *Vernau v. Vic's Market, Inc. .*, 896 F.2d 43, 45–47 (3rd Cir.1990) (determining accrual according to when trustees should have known of injury, yet stating that it was using Supreme Court's "tolling" doctrine). Here, the issue is accrual, not tolling.

exercise of reasonable diligence, should have known of the deficiencies in D'Elia's reporting earlier than they did. *See Vernau,* 896 F.2d at 47 n. 10 (stating that trustees must not be held "to a standard of omniscience").

That Debra D'Elia signed the Remittance Reports does not alter this conclusion. First, it is beyond cavil that the mere signature of an employee at the bottom of a Remittance Report is not equivalent to the wealth of information possessed by the funds in *Michigan United* and *Vernau* and from which those funds should have deduced that the employers were filing inaccurate reports. Second, reasonable diligence requires the Funds to look only at the payroll information provided on the Remittance Reports—such as the employee's name, social security number, *hours worked, and wages earned*—to determine the amount of contributions due. This is the information the Funds appropriately rely on; and no signature is required or relied on as part of this information.

■ The Funds operate on a self-reporting system, that is, a system under which employers provide the information necessary to calculate the amount of monthly contributions due; the Funds do not go out into the field and collect the data themselves. Under such a system, the Funds rely on the employers who subscribe to their plans to submit honest and accurate information. *See Whitworth Bros. Storage Co. v. Central States, S.E. & S.W. Areas Pension Fund,* 982 F.2d 1006, 1018 (6th Cir.1993). Indeed, this reliance on the honesty and accuracy of the reporting employers is the heart that animates the self-reporting system. Even D'Elia admits that only with an employer's honest and accurate completion of the reports can the Funds be expected to calculate how much an employer owes in monthly contributions. *See Connors,* 935 F.2d at 342.[9] To abandon this system and instead require employee-benefit funds to verify every piece of datum received from every employer would impose on funds burdens so severe as to frustrate the efficiency goals of a self-reporting system. *See Sheet Metal Workers, Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1282 (3rd Cir.1991) ("The collective bargaining agreements contemplated a self-reporting system and certification for the obvious purpose of vitiating the need for constant and disruptive audits of the employer's records by plaintiffs." (internal quotation marks omitted)). Indeed, it would be "administratively impossible for [a fund] to review each and every contribution it receives from an employer for verification" of the facts represented in the report. *See Whitworth Bros.,* 982 F.2d at 1018.[10] Thus, funds are entitled to rely exclusively on the information that they require employers to report.[11]

The information that the Funds here required employers to provide, and on which the Funds here relied, does not include the name of the person signing the Remittance Report. This is evident from the fact that the Funds do not even require that the Remittance Reports be signed; an unsigned report will be processed like any other. It

---

**9.** *See also Trustees of National Automatic Sprinkler Indus. Pension Fund v. American Automatic Fire Protection,* 680 F.Supp. 731, 738 (D.Md. 1988) (denying employer's motion for summary judgment because the record supported the conclusion that the employer submitted incomplete reports, thus preventing the trustees from discerning whether contributions owing had been made).

**10.** The facts of the case at bar well illustrate this point. Adopting D'Elia's proposed standard would require the Funds to investigate all signatures on all Remittance Reports, even those that were illegible, and it would arguably require investigation of names printed on other employer documents (such as letterhead) and names of those who answer the phone at the employer's place of business. According to D'Elia, if the

name of any employee who signed a report, wrote a letter, or answered a phone did not appear on the monthly report in the list of covered employees, that should raise suspicion with the Funds such that they would inquire further why the individual was not listed as a bargaining- or non-bargaining-unit employee. Of course, under this scheme, the Funds would quickly become mired in a process of searching for, investigating, and verifying information that is, almost uniformly, irrelevant. To mandate such a wasteful expenditure of time by the Funds would directly contravene ERISA's goal of establishing efficient, self-reporting systems.

**11.** Of course, as *Michigan United* and *Vernau* reflect, funds are reasonably charged with knowledge of errors that appear on the face of the documents or information submitted.

follows that the information on the signature line was simply irrelevant to the Funds' task of calculating the amount of contributions due, and thus there was no need for the Funds to examine or verify that information. Accordingly, the Funds were under no obligation to detect the "mismatch" between the name (Debra D'Elia) listed on the signature line and the absence of that name on the list of covered employees. In other words, reasonable diligence did not require the Funds to investigate any information on the Remittance Reports beyond the data necessary to compute the monthly contributions, and such data did not include the name of the person signing the report.[12]

From this it further follows that under the discovery rule, the Funds should not be expected to have discovered the omissions in D'Elia's reports until May 1997, when D'Elia stopped filing the Remittance Reports altogether. Until that time, there were no facts in the Funds' possession that should have caused them to inquire further about the accuracy of D'Elia's reports or to question their completeness. *See Northern California Retail Clerks Unions,* 906 F.2d at 1373 (stating that there is "no duty ... to make an independent verification ... if the facts known to [the fund do] not give [it] reason to know of the error"). In sum, because "there was no indication on the face of [the] monthly reports ... that the terms of the agreement had not been followed," *Sheet Metal Workers, Local 19,* 949 F.2d at 1283, there is no basis for concluding that the Funds should

have known of their injury prior to the time at which they actually discovered it, in this case, May 21, 1997: The reports and contributions for April 1997 were due on May 20, 1997; only on May 21, when D'Elia's April report had not been received by the Funds, should reasonable diligence have alerted the Funds that D'Elia's reporting might have been deficient.[13] Accordingly, under the discovery rule, this cause of action arose on May 21, 1997. *See Northern California Retail Clerks Unions,* 906 F.2d at 1372 (holding that statute of limitations does not begin to run until plaintiff knows or should know of the injury that is the basis of its action). Because the complaint was filed four months later, on September 15, 1997, obviously within the five-year limitations period, none of the Funds' prayer for damages is time-barred. Thus, D'Elia's motion for partial summary judgment on the statute of limitations defense must be denied, and the Funds will be permitted to recover all damages incurred between May 1981, and the present.

An appropriate Order will issue.

---

**12.** In any event, the alleged discrepancy between the appearance of an employee's name on a signature line and the absence of that employee's name from the list of employees for whom contributions are being paid was insufficient to "awaken inquiry" such that the Funds should have investigated Debra D'Elia's status under the Participation Agreement; such an alleged discrepancy certainly is not informative, and it is at best ambiguous. That is, even if the Funds had recognized that Debra D'Elia had signed the Remittance Reports but was not listed as a non-bargaining-unit employee, the Funds still would have had no duty to inquire into her status as an employee, and it still would have been reasonable for them to assume that D'Elia's reporting was honest and accurate. Debra D'Elia, as preparer of the reports, might have been an independent contractor, or might have been a member of another union at D'Elia, or might not have been a member of any union at all, or might not

even have been an employee of D'Elia. In any of these capacities, she might prepare and sign the reports but not list herself as a covered employee. Indeed, the facts of this case support this conclusion. Debra D'Elia prepared and signed at least one Remittance Report in 1982; however, D'Elia represents that she did not become a non-bargaining-unit employee until 1983.

**13.** When the Funds did become aware, for the first time, of D'Elia's failure to provide complete reports, they immediately began investigating the accuracy of past reports and the extent to which past contributions might have been delinquent. This investigation ultimately led the Funds to hire the accounting firm to audit D'Elia. Certainly this conduct suggests that the Funds acted with diligence upon first learning of the deficient reports.